[621 NYS2d 617]

In the Matter of FRANCIS E. MAHER, Also Known as FRANK E. MAHER, Respondent. FRANCIS E. MAHER, JR., Also Known as FRANK E. MAHER, JR., Appellant.

Second Department, December 27, 1994

APPEARANCES OF COUNSEL

*Snitow & Pauley,* New York City *(William H. Pauley, III,* and *Lyle D. Brooks* of counsel), for appellant.

*Irwin F. Simon,* New York City, for respondent.

## OPINION OF THE COURT

FRIEDMANN, J.

On this appeal—which appears to represent a case of first impression at the appellate level—we are asked to consider the propriety of a determination by the Supreme Court, Kings County (Leone, J.), embodied in a judgment entered October 8, 1993, that the respondent, Francis E. Maher, was not incapacitated as that term is defined in the recently enacted Mental Hygiene Law article 81. Based upon this determination, the court dismissed, with prejudice, the petition for a guardian for the respondent's property which had been brought by Francis E. Maher, Jr., the respondent's son. Since the court properly applied the standards and carried out the legislative intent of Mental Hygiene Law article 81, we now affirm.

### THE FACTS OF THIS CASE

On December 11, 1992, the respondent, attorney Francis E. Maher, suffered a stroke which left him with right-sided hemiplegia and aphasia. He was admitted to St. Luke's-Roosevelt Hospital where, on December 12, he underwent surgery,

*inter alia,* to evacuate a hematoma from the frontal portion of his brain. For some time after the operation, the respondent remained partially paralyzed and aphasic, although occasionally he was able to speak a few words and to move a bit on his right side.

By order to show cause dated December 17, 1992, the appellant commenced a proceeding pursuant to Mental Hygiene Law article 77 for the appointment of a conservator. On December 17, 1992, the Honorable Sebastian Leone, Justice of the Supreme Court, appointed Ronald M. LaRocca, Esq., as temporary receiver, and Margaret M. Bomba, Esq., as the guardian ad litem, for the respondent. The guardian ad litem filed a report dated January 4, 1993, wherein she stated that due to the respondent's physical condition "he is presently incapable of managing his own business and financial affairs", and she recommended the appointment of a conservator of his property. The guardian ad litem objected to the appointment of Ronald M. LaRocca as conservator because of a "perceived conflict of interest"—due to the fact that LaRocca also represented a hospital that owed the respondent considerable sums in attorneys' fees for services rendered in past litigation. By order dated January 20, 1993, the Supreme Court permitted LaRocca to withdraw as temporary receiver and appointed the appellant and Elizabeth Maher, the respondent's sister and for many years his office manager, as temporary receivers pending the conservatorship hearing, upon the posting of an undertaking in the sum of $1,000,000 with an authorized surety company. LaRocca subsequently became the attorney for the appellant in the instant proceeding.

On March 31, 1993—the day on which the respondent executed a power of attorney naming the appellant as his "attorney-in-fact"—the temporary receivers advised the court that the respondent's condition had "improved dramatically" and that the appellant wished to discontinue the proceeding. The guardian ad litem joined in the application, and the court granted the request orally, directing the parties to settle an order withdrawing the petition.

However, according to the appellant, on the very night of the withdrawal petition, namely March 31, 1993, the respondent's condition abruptly deteriorated, and he began to behave in an irrational and abusive manner. At about this same time, the respondent also declared his intention to marry Ms. Helen Kelly, an attorney formerly associated with his law firm, whom he had been seeing since shortly after the death of his

first wife in March of 1992. It was the guardian ad litem's considered opinion that the respondent's agitation was provoked by his sons' attempts to isolate him from Ms. Kelly and other friends, as well as by their refusal to permit him access to funds of any kind.

On May 7, 1993, the appellant announced his intention to go forward with the conservatorship proceeding, based on his allegation that the respondent had become "confused and irrational". On May 19, 1993, the respondent revoked the previously issued power of attorney in favor of the appellant, and executed a new power of attorney in favor of Irwin F. Simon, an attorney who had done per diem work for the respondent's law firm for many years. The guardian ad litem submitted her interim report dated May 20, 1993, along with a proposed order to withdraw the petition. The appellant promptly opposed the guardian ad litem's motion to dismiss, and requested a hearing to explore the need for the appointment of a conservator. The guardian ad litem submitted a "Supplemental Report" on June 1, 1993, defending herself against the appellant's charges of bias, and again urging the dismissal of the petition.

On June 1, 1993, the respondent disappeared from the home that he had shared with the appellant and another of his sons. On June 17, 1993, the respondent married Ms. Kelly.

At the outset of the hearing, which was held on June 21, 1993 and July 16, 1993, the proceeding was converted, with the consent of all parties, to one for the appointment of a guardian for property management under Mental Hygiene Law article 81. At the hearing, testimony was taken from the respondent's sister, Betty Maher, two of his sons, George and the appellant, his speech pathologist, Susan Sachs, and Dr. Valerie Lanyi, a rehabilitation specialist who had treated the respondent at the Rusk Institute, and who had seen him in consultation as recently as June 10, 1993. Testifying for the respondent were the respondent himself, and his wife, Mrs. Helen Kelly Maher. At the conclusion of the hearing, the court found that the appellant had not carried his burden of proving by the requisite clear and convincing evidence that (1) the respondent was incapacitated, and (2) a guardian was necessary to manage his property and financial affairs.

### THE ENACTMENT OF MENTAL HYGIENE LAW ARTICLE 81

The Legislature enacted Mental Hygiene Law article 81 (L 1992, ch 698), effective April 1, 1993, to remedy the perceived

deficiencies in Mental Hygiene Law former articles 77 and 78, which had authorized the appointment of a conservator for the property or a committee for the person, respectively, of individuals whose ability to care for their property was substantially impaired or who were adjudged to be incompetent.

Mental Hygiene Law former article 78, the committee statute, required a finding of complete incompetence. That statute provided no guidance regarding what constituted incompetence, no standard governing the type of proof required to establish incompetence, and no specification respecting the range of powers assumed by a "committee of the person". However, a finding of incompetence resulted in a complete loss of civil rights and the accompanying stigma of total incapacity. Because of this stigma and loss of civil rights, the judiciary became increasingly reluctant to invoke article 78. This reluctance, together with the statutory preference for a conservator which appeared in both Mental Hygiene Law former articles 77 and 78, resulted in the virtual abandonment of the committee procedure (Koppell and Munnelly, *The New Guardian Statute: Article 81 of the Mental Hygiene Law,* 65 NY St BJ [No. 2] 16 [Feb. 1993] [hereinafter Koppell and Munnelly]).

Mental Hygiene Law article 77, the conservatorship statute, enacted in 1972, allowed for the appointment of a conservator for property only. While certain language in article 77 regarding the "personal well-being" of the conservatee suggested the possibility of using conservators of the property to exercise authority over the person of the individual, the needs of the population to be served by guardianship statutes proved so varied that the relief ostensibly offered by article 77 simply did not in fact afford either the authority or the flexibility necessary to address them all (Koppell and Munnelly, *op. cit.).*

On April 30, 1991, the Court of Appeals decided *Matter of Grinker (Rose)* (77 NY2d 703), holding, *inter alia,* that Mental Hygiene Law article 77 did not authorize a court to grant to a conservator the power to commit the conservatee to a nursing home. Such power to so significantly displace personal liberty, the Court explained, can be granted only pursuant to Mental Hygiene Law article 78, the committee statute, "with its full panoply of procedural due process safeguards" *(Matter of Grinker [Rose], supra,* at 710). That decision, although it clarified the respective reaches of articles 77 and 78, reinstated the courts' earlier dilemma. It further left without

recourse the majority of incapacitated individuals who, although somewhat handicapped, were not hopelessly incompetent, and who, notwithstanding their need for varying degrees of assistance with their personal affairs as well as with property management, were not prepared utterly to relinquish in exchange therefor a lifetime's investment in integrity, autonomy, and dignity *(see,* Mental Hygiene Law § 81.01).

### THE NEW FRAMEWORK ESTABLISHED BY MENTAL HYGIENE LAW ARTICLE 81

In response to this predicament, in 1992 the New York State Law Revision Commission proposed the creation of a single statute to replace Mental Hygiene Law articles 77 and 78. The projected legislation envisioned "a new type of guardianship proceeding based on the concept of the least restrictive alternative—one that authorizes the appointment of a guardian whose authority is appropriate to satisfy the needs of an incapacitated person, either personal or financial, while at the same time tailored and limited to only those activities for which a person needs assistance. The standard for appointment under this new procedure focuses on the decisional capacity and functional limitations of the person for whom the appointment is sought, rather than on some underlying mental or physical condition of the person. The proposal encouraged the participation of the allegedly incapacitated person in the proceeding to the greatest extent possible" (Koppell and Munnelly, *op. cit.,* at 17).

As a threshold matter, the new legislation emphasizes that "it is desirable for and beneficial to persons with incapacities to make available to them the least restrictive form of intervention which assists them in meeting their needs", while at the same time permitting them "to exercise the independence and self-determination of which they are capable". Such intervention was therefore to be "tailored to the individual needs of that person", taking into account "the personal wishes, preferences and desires of the person", and affording the person "the greatest amount of independence and self-determination and participation in all the decisions affecting [his] life" (Mental Hygiene Law § 81.01).

In exercising its discretion to appoint a guardian for an individual's property (the focus of the instant proceeding), a court must make a two-pronged determination: first, that the appointment is necessary to manage the property or financial

affairs of that person, and, second, that the individual either agrees to the appointment or that the individual is "incapacitated" as defined in Mental Hygiene Law § 81.02 (b) (Mental Hygiene Law § 81.02 [a]).

As to the first prong, "the court shall consider the report of the court evaluator [heretofore the guardian ad litem, although with certain significant differences, as laid out in Mental Hygiene Law § 81.09] * * * and the sufficiency and reliability of available resources [e.g., powers of attorney, trusts, representatives and protective payees] * * * to provide for personal needs or property management without the appointment of a guardian" (Mental Hygiene Law § 81.02 [a] [2]; § 81.03 [e]).

As to the second prong, a determination of incapacity must be based upon clear and convincing evidence that the person is likely to suffer harm because he is unable to provide for property management and cannot adequately understand and appreciate the nature and consequences of such inability. The burden of proof is on the petitioner (see, Mental Hygiene Law § 81.02 [b]; § 81.12 [a]). In reaching its determination, the court must give primary consideration to the functional level and functional limitations of the person, including an assessment of the person's ability to manage the activities of daily living related to property management (e.g., mobility, money management, and banking), his understanding and appreciation of the nature and consequences of any inability to manage these activities, his preferences, wishes, and values regarding management of these affairs, and the nature and extent of the person's property and finances, in the context of his ability to manage them (Mental Hygiene Law § 81.02 [c]; § 81.03 [h]).

Even if all of the elements of incapacity are present, a guardian should be appointed only as a last resort, and should not be imposed if available resources or other alternatives will adequately protect the person (see, Law Rev Commn Comments, reprinted in McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.02, 1994 Pocket Part, at 241-242).

### ISSUES RAISED ON THIS APPEAL

■ Upon our review of the record before us, we are satisfied that the Supreme Court properly assessed the evidence in accordance with both the letter and the spirit of the new Mental Hygiene Law article 81.

Contrary to the appellant's contention, the clear and con-

vincing evidence in the hearing record establishes only that the respondent suffers from certain functional limitations in speaking and writing, but not that he is likely to suffer harm because he is unable to provide for the management of his property, or that he is incapable of adequately understanding and appreciating the nature and consequences of his disabilities. Indeed, by granting a power of attorney to Irwin Simon, and by adding his wife as a signatory on certain of his bank accounts, the respondent evidenced that he appreciated his own handicaps to the extent that he effectuated a plan for assistance in managing his financial affairs without the need for a guardian.

Several witnesses testified to the respondent's ability to understand what he was told and to make his wishes known demonstratively. For example, the respondent's sister testified that she believed that her brother understood her when she provided him with information about the office. The appellant himself conceded that he routinely discussed collection and related business matters with the respondent, and that the respondent had regularly indicated his satisfaction with the appellant's management of his law firm's affairs. Dr. Lanyi, the physician in charge of the respondent's rehabilitation, expressed her doubt that at the time of his discharge from the Rusk Institute in mid-March 1993, the respondent could have managed his checkbook as he had formerly done, but opined that he was nonetheless, even at that time, aware of the magnitude of the sums he was spending. Moreover, according to Dr. Lanyi, when she last saw the respondent on June 10, 1993, her patient appeared to understand everything she said to him or asked of him, noting that on that occasion he had consistently responded to her remarks and inquiries in a prompt, calm manner, with appropriate words or gestures. The respondent's speech therapist, too, documented a steady improvement in her patient's ability to comprehend and respond to the tests she administered. Generally, the consensus among all witnesses was that the respondent had made, and was continuing to make, dramatic progress in his ability to comprehend information and to express himself—as well as in his mobility, which seemed essentially restored to normal— since the initial cerebrovascular episode.

Moreover, the court, which was in the best position to observe the respondent throughout the hearing, remarked that he reacted fittingly to the proceedings—even to the point of making it clear to his attorney and the court when he felt

that certain questions or answers were objectionable. The court was further persuaded that the respondent knew the correct responses to the questions put to him on the stand, although he was not able verbally to express them.

This case is therefore distinguishable from those relied upon by the appellant, where the respondent had demonstrably ceased to comprehend his practical affairs, as evidenced, *inter alia,* by a documented dissipation or impending loss of substantial assets *(see, e.g., Matter of Ginsberg [Ginsberg],* NYLJ, Jan. 3, 1992, at 27, col 6; *Matter of Flowers [Dove],* 197 AD2d 515; *Matter of Rochester Gen. Hosp. [Levin],* 158 Misc 2d 522). No such loss or imminent threat of loss has been even alleged, let alone proven, in the case at bar. It is further worthy of note that two of these cases, *Ginsberg* and *Flowers,* were decided under now-repealed Mental Hygiene Law article 77, where the legal standard for a determination of incapacity—whether the respondent suffered from a substantial impairment of his ability to care for his property and manage his finances—was expressly found wanting by the Legislature in fashioning Mental Hygiene Law article 81 *(see,* Law Rev Commn Comments, reprinted at McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law art 81, 1994 Pocket Part, at 242-243).

The instant case more closely resembles those where the allegedly incapacitated person has effectuated a plan for the management of his affairs which obviated the need for a guardian *(see, e.g., Matter of Tait,* NYLJ, May 31, 1994, at 28, col 1; *Matter of Lambrigger,* NYLJ, May 31, 1994, at 37, col 1; *Matter of Gelezewski,* NYLJ, Nov. 17, 1993, at 30, col 2; *Matter of Anonymous, R.A.,* NYLJ, Sept. 28, 1993, at 27, col 2; *Matter of Presbyterian Hosp. [Early],* NYLJ, July 2, 1993, at 22, col 2 [Sup Ct, NY County]).

Although the appellant tries to distinguish the foregoing cases on the ground that the assets at issue were far more modest than the very substantial estate involved here, we do not find the size of the property involved, standing alone, to be dispositive. Rather, in the matter before us, there has been no showing that the respondent has lost the ability to appreciate his financial circumstances, or that others have taken control of his affairs without his comprehension or rational supervision. There has further been no demonstration of any waste, real or imminent, of the respondent's assets. There is an absence of proof that the respondent's chosen attorney and his wife (who is also an attorney) are incapable of managing the

property at issue in accordance with the respondent's wishes.* Under such circumstances, the appellant has failed to demonstrate the need for a guardian under the standards enunciated in Mental Hygiene Law article 81.

■ The court did not err in excluding from evidence certain "tests" or "demonstrations" of the respondent's inability to expatiate on the meaning of a complicated legal text, to write checks in differing amounts to different payees, to separate and count diverse kinds of currency, and to explain his execution of two successive powers of attorney. The court was already well aware of the respondent's difficulty—due to his expressive aphasia and apraxia—in verbally communicating his understanding of the questions posed to him, and in writing or counting numbers clearly—although he could make himself understood to those to whom he could demonstrate nonverbally. Therefore, such "tests" would not have served to inform the court about the material issue before it—namely, whether the respondent appreciated the nature and consequences of his alleged inability personally to manage his property, and that he could suffer harm as a result *(see,* Mental Hygiene Law § 81.02 [b]). As the evidence sought to be elicited would merely have distracted the court from the main point at issue, the court properly exercised its discretion in denying the admission of that evidence *(see, Harvey v Mazal Am. Partners,* 79 NY2d 218, 223-224; *People v Acevedo,* 40 NY2d 701, 704-705; *Clark v Brooklyn Hgts. R. R. Co.,* 177 NY 359, 361; *Riddle v Memorial Hosp.,* 43 AD2d 750, 751; Richardson, Evidence §§ 134, 136 [Prince 10th ed]).

■ The court was similarly justified in refusing to allow the appellant's expert, Dr. Gannon, who had never examined the respondent, to testify to the respondent's alleged incapacitation based upon his appearance in the courtroom. As the court correctly ruled, the appellant could not compensate for his failure to request a timely psychiatric examination of the respondent by permitting Dr. Gannon to draw professional conclusions about the respondent in such an improper setting and under such stressful conditions. Dr. Gannon was also correctly precluded from testifying to the respondent's compe-

---

* It is further worthy of note that there has been no serious allegation, let alone demonstration, that either Ms. Kelly or Mr. Simon—two individuals with whom the respondent had long been acquainted *(cf., Matter of Ginsberg [Ginsberg],* NYLJ, Jan. 3, 1992, at 27, col 6, *supra)*—used fraud, duress, or undue influence on the respondent in order to bring about either his marriage or his execution of a second power of attorney.

tence based upon his review of the respondent's hospital records, which the appellant's counsel had subpoenaed to his office on May 24, 1993, pursuant to his client's power of attorney, some five days after that power of attorney had been revoked. There is further no merit to the appellant's contention that the respondent had waived his physician-patient privilege by permitting the appellant's witness, Dr. Lanyi, to testify "full[y]" to her assessment of his inpatient condition, because the record reveals that Dr. Lanyi relied only upon her own notes during the hearing, and at no point consulted the respondent's charts from St. Luke's-Roosevelt Hospital or the Rusk Institute.

■ Finally, the hearing court erred in admitting into evidence the report of the court evaluator because, although present at the hearing, the court evaluator did not take the stand and submit to cross-examination (see, Mental Hygiene Law § 81.12 [b]). We conclude that this error was harmless, however, in view of the fact that the court expressly based its decision upon its own observations of the respondent during the proceedings, and upon the testimony of the various witnesses. Moreover, the record amply supports the Supreme Court's conclusion that the appellant failed to establish by the requisite clear and convincing evidence the respondent's need for a guardian of his property under the standards enunciated in Mental Hygiene Law article 81, independently of the improperly admitted court evaluator's report (see, e.g., Berger v Estate of Berger, 203 AD2d 502; Matter of Wieczorek, 186 AD2d 204; Matter of LoGuidice, 186 AD2d 659, 660; Turner v Danker, 30 AD2d 564).

Therefore, the judgment is affirmed insofar as appealed from.

O'BRIEN, J. P., JOY AND KRAUSMAN, JJ., concur.

Ordered that the judgment is affirmed insofar as appealed from, with costs.