■ In the Matter of MARGUERITE VV., a Person Alleged to be Incapacitated, Appellant. DAVID G. KRUCZLNICKI, as President and Chief Executive Officer of Glens Falls Hospital, Respondent; JOSEPH MENALDINO, as Commissioner of the Warren County Department of Social Services, Respondent. [640 NYS2d 311] —Cardona, P. J. Appeal from an order of the Supreme Court (Moynihan, Jr., J.), entered November 10, 1994 in Warren County, which granted petitioner's application, in a proceeding pursuant to Mental Hygiene Law article 81, to appoint a guardian for respondent's personal needs.

In April 1994, respondent, then age 79, was admitted to the hospital and placed in intensive care due to a severe urinary tract infection. She underwent surgery for the placement of a ureteral stent to address problems caused by a large kidney stone. According to Raymond Maddocks, the urologist who performed the surgery, the stone could not be removed because respondent was too ill. After the hospital determined that respondent no longer required acute hospital care, plans were made to discharge her back into the community. Prior to her hospital admission she had been living in an apartment. The hospital, however, recommended that respondent be discharged to a nursing home. Respondent refused. Petitioner, as the hospital's representative, commenced this proceeding alleging that respondent was incapacitated within the meaning of the Mental Hygiene Law and that the appointment of a guardian of her person was warranted (see, Mental Hygiene Law § 81.02). After a hearing, Supreme Court granted the petition, prompting this appeal.

Contrary to respondent's contention, we find that there was clear and convincing evidence adduced at the hearing to support Supreme Court's conclusion that respondent's functional limitations impaired her ability to provide for her personal needs, that she lacked an understanding to appreciate the nature and consequences of her limitations and that, as a result, respondent would suffer harm if a guardian was not appointed (see, Mental Hygiene Law § 81.02 [b] [1], [2]). Several physicians testified to respondent's physical and mental condition and her ability to understand her situation. Maddocks testified that after he performed the initial surgery on respondent, she refused further treatment and discharged him. Respondent wanted the kidney stone removed, which Maddocks opined would be "extremely unwise" given respondent's condition. The stent was also temporary but respondent refused to have it replaced and ultimately a court order was obtained to perform the necessary surgery. Respondent also discharged

her attending physician and refused treatment from his replacement. Other testimony revealed that respondent continually refused medical tests and other forms of treatment. The physicians opined that respondent did not understand and appreciate the nature and consequences of her limitations. A psychiatrist who examined respondent came to the same conclusion. Unfortunately, the medical evidence revealed that she required 24-hour-a-day supervision. She could not ambulate as a result of joint problems and was bedridden. She had a hearing impairment and could not dress herself. She was incontinent and unable to keep herself clean. She required assistance from at least one person in transferring her from her bed to a chair.

In developing a discharge plan for respondent, four alternative schemes were investigated. The first involved placement in the community in general. Prior to respondent's admission to the hospital, she had been a client of the local social services agency. According to her caseworkers, the necessary services to enable respondent to live at home could not be provided because of her abusive behavior to agency employees and volunteers. Certain community services refused to provide assistance because of respondent's past conduct. In addition, other services were conditioned on respondent's retaining a physician, which she refused to do. One caseworker opined that based on respondent's past behavior it was unlikely that she would maintain a continuous treatment relationship with a physician. Placement with respondent's family was also not a viable alternative given the lack of a meaningful relationship between respondent and her family.

The third alternative considered was respondent's desire to live with Margaret Eddy, a friend who had assisted her before she entered the hospital. Eddy, who was 72 at the time of the hearing, admitted that she was in need of a cataract operation and was undergoing treatment for an enlarged heart. A caseworker testified that Eddy's physician requested that respondent be removed from Eddy's home due to the latter's high blood pressure and continuing failing health. A home simulation study indicated that Eddy was unable to provide the required care. Eddy could not transfer respondent from a bed to a chair and Eddy admitted that there would be times when she would have to leave respondent alone. The testimony of the physicians indicated that if respondent was not moved, she would suffer bed sores and an increased likelihood of pneumonia and recurrent urinary difficulties. One physician concluded that respondent would suffer harm if she was placed

in Eddy's care. Finally, another physician testified that respondent would suffer harm if returned home in general. This led to the fourth and final alternative of placement in a nursing home, which was determined to be the only viable option. Two physicians recommended such placement but respondent refused.

We agree with Supreme Court's conclusion that appointment of a guardian was necessary to provide for respondent's personal needs (*see*, Mental Hygiene Law § 81.02 [a] [1]) and that she was incapacitated (*see*, Mental Hygiene Law § 81.02 [a] [2]). The record evidence demonstrates that respondent was unable to manage the activities of daily living related to her person and that she lacked an understanding and appreciation of the nature and consequences of that inability. While we are aware that a guardian should be appointed only as a last resort (*see, Matter of Maher*, 207 AD2d 133, 140, *lv denied* 86 NY2d 703), the record reveals that the other available alternatives would not adequately protect respondent's person (*see, supra*). In addition, as it has been noted, Supreme Court "was in the best position to observe the respondent throughout the hearing" (*supra*, at 141). Thus, the determination that respondent is incapacitated and in need of a guardian will not be disturbed (*see, Matter of Donald F. L.*, 210 AD2d 227).

Mercure, Casey, Yesawich Jr. and Spain, JJ., concur. Ordered that the order is affirmed, without costs.