OPINION OF THE COURT
Raymond E. Cornelius, J.
Pursuant to an order, dated May 26, 1993, the above-named alleged incapacitated person (AIP) and others required to receive notice of the petition were directed to show cause
*524 before the undersigned, on June 14, 1993, why a guardian should not be appointed under article 81 of the Mental Hygiene Law. Mr. Levin has continuously been a patient of the Rochester General Hospital since July 20, 1992, at which time he had been admitted for certain medical problems experienced while a patient in a nursing home. This special proceeding was commenced by the hospital because the patient’s adult son, who had been previously granted a health care proxy, as well as having been appointed under a power of attorney, allegedly refused to cooperate in obtaining Medicaid reimbursement to cover the hospital expenses, which, to date, exceed $75,000. Although section 81.06 (a) (7) of the Mental Hygiene Law permits the chief executive officer of a hospital to commence a proceeding for the appointment of a guardian, the petition was verified by the vice-president of administration of the Rochester General Hospital. Nevertheless, the provisions of this section are almost all inclusive, and among the persons enumerated, who may commence a proceeding for the appointment of a guardian, would be "a person otherwise concerned with the welfare of the person alleged to be incapacitated”. (Mental Hygiene Law § 81.06 [a] [6].) Thus, under the circumstances, the court concludes that this proceeding was begun by someone authorized to commence such proceeding.
The order to show cause conformed to the requirements of Mental Hygiene Law § 81.07, in regard to notice, including the statutory language for the legend in 12 point or larger boldface double-spaced type, which advised the AIP, among other information, that a court evaluator had been appointed to explain the proceeding and investigate the claims made in the application. In fact, this order did not include an appointment of a court evaluator, but did provide for appointment of the Mental Hygiene Legal Service, as counsel, pursuant to section 81.10 of the Mental Hygiene Law. Also, a temporary guardian was appointed, pursuant to Mental Hygiene Law § 81.23, in order to complete the Medicaid application process, which was due to expire prior to the return date of the application.
Generally, Mental Hygiene Law § 81.09 requires the court to appoint a court evaluator, and that section sets forth, in some detail, the purpose, duties and responsibilities of such appointee. Nevertheless, section 81.10 (g) of the Mental Hygiene Law provides that the court may dispense with the appointment of a court evaluator in those cases where counsel is appointed. Although the appointment of counsel is, in some *525 instances, discretionary with the court, such appointment is required under other circumstances, including expression of a wish on the part of the AIP to contest the petition, refusal to consent to a request in the petition for placement in a nursing home or other residential facility or where the petitioner requests temporary powers under Mental Hygiene Law § 81.23. (Mental Hygiene Law § 81.10 [c] [2], [3], [5].) As aforementioned, the order to show cause included the provisional remedy of an appointment of a temporary guardian, pursuant to Mental Hygiene Law § 81.23 (a), and this directive, alone, would require appointment of counsel. In addition, as will be hereinafter discussed, Mr. Levin was incapacitated to such an extent that he could not consent to transfer to a nursing home or other residential facility. Therefore, in the court’s opinion, he likewise could not consent to the appointment of a guardian and should be considered as in the same position as an AIP who wishes to contest the petition. Again, under such circumstances, counsel would also be required to be appointed by the court.
Although Mental Hygiene Law article 81 contains elaborate provisions for the appointment and duties of a court evaluator, there is no reason why counsel could not perform most of these same services. As a practical matter, the appointment of both a court evaluator and counsel has the potential for exhausting the resources of an AIP, who as in this case, may have relatively limited assets. Accordingly, in such cases, where it is also apparent that counsel will be required to be appointed for an AIP, it might be better practice to dispense with the appointment of a court evaluator.
In the pending case, Mr. Levin was a resident of a hospital at the time of the application, which fact permits the court to appoint the Mental Hygiene Legal Service as either court evaluator or counsel, but not both. (Mental Hygiene Law § 81.09 [b] [2], [3]; § 81.10 [e].) Thus, because the Legislature has recognized that the Mental Hygiene Legal Service has sufficient expertise to perform either function, there is no reason why that agency should not be appointed counsel, and perform essentially the same services as a court evaluator. Therefore, notwithstanding the formal, statutory language, contained in the order to show cause, informing the respondent that a court evaluator had been appointed, the failure to make such appointment should not render the proceeding *526 defective inasmuch as counsel was appointed. (See, Mental Hygiene Law § 81.42 [a].)
On the return date of the petition, a hearing was commenced at the Rochester General Hospital inasmuch as Mr. Levin was physically unable to be brought to the courthouse. (Mental Hygiene Law § 81.11 [c].) One of the stated purposes for requiring the AIP to be present at the hearing is to permit the court to obtain its own impression of the person’s capacity. Based upon the court’s own observations, in addition to the testimony of a psychiatrist, who examined the patient on May 7, 1993, it was apparent that Mr. Levin was completely unable to participate in the hearing and that no meaningful participation would result from his continued presence. Accordingly, when the hearing was continued, five days later, at the courthouse, in order to permit the adult son to be subpoenaed as a witness, Mr. Levin’s continued presence was not required by the court. (Mental Hygiene Law § 81.11 [c] [2].)
Based upon the evidence adduced at the hearing, this court has determined that the appointment of a guardian is necessary to provide for the personal needs of Mr. Levin, and also to manage his property and financial affairs. (Mental Hygiene Law § 81.02 [a] [1].) In addition, however, before the appointment of a guardian is justified, the AIP must agree to the appointment, or the court must further find, based upon clear and convincing evidence, that the AIP is incapacitated as defined by the statute. At one point during the hearing, the staff attorney for the Mental Hygiene Legal Service stated that he, as counsel, would consent to the appointment of a guardian, and further, that his client had not voiced any opposition to such appointment. In the court’s opinion, this is insufficient to support a finding that an AIP actually has agreed to the appointment of a guardian. Therefore, it was incumbent upon the petitioner, to establish incapacity, by clear and convincing evidence.
In the pending proceeding, the testimony of the psychiatrist, together with the medical records from the hospital, disclosed that Mr. Levin suffers from a severe, progressive dementia, which may be ascribed to senile brain disease, arteriosclerotic deterioration and/or Alzheimer’s disease. Communication with this 79-year-old male has been difficult, if not impossible, and he generally remains mute, with the exception of uttering certain prelearned phrases. There is no prognosis for improvement in his condition, and the psychiatrist recommended that Mr. Levin be admitted to a skilled nursing facility in order to *527 permit around-the-clock care for his survival. Thus, the court has concluded that the petitioner has established, by clear and convincing evidence, that Mr. Levin is a person likely to suffer harm because of the inability to provide for his personal needs and property management and cannot adequately understand and appreciate the nature and consequences of such inability, and accordingly, is an incapacitated person, as defined by the statute. (Mental Hygiene Law § 81.02 [b] [1], [2].) In reaching this determination, the court has made an assessment of the factors contained in section 81.02 (c) and (d) of the Mental Hygiene Law, and has given primary consideration to his functional level and functional limitations.
Notwithstanding this court’s determination of incapacity, there remains the question of whether or not the power of attorney and health care proxy, previously executed by Mr. Levin, presumably during periods when he had not been incapacitated, should obviate the necessity for the appointment of a guardian. In this regard, the testimony of Mr. Levin’s adult son, at the continuation of the hearing, could best be described as vague and uncertain. He was unable, for example, to recall how many times he had seen his father since the hospitalization in 1992, or the last time he had visited at the hospital. He further indicated that he had assumed control and became president of the family printing company after his father retired in late 1991, but was quite vague concerning any continuing interest of his father in the business, or benefits derived therefrom. Similarly, he testified that his father’s home had been sold several years ago, but was unable to account for the proceeds, except to state that these funds had been exhausted by payments, in cash, for private nursing duty.
Specifically, in regard to the issue about the alleged failure to submit a Medicaid application, Mr. Levin’s son was unable to explain why he failed to respond to at least 10 requests by hospital personnel, made between September and November 1992, to meet with them and/or cooperate in completion of the Medicaid application. The claim made by the witness, during his testimony, to the effect that he believed that the necessary papers had been submitted, and was unaware of the denial of the application for medical assistance, is belied by his receipt of a letter dated March 25, 1993, and delivered to him by Federal Express. In this correspondence, a representative of patient financial services for the hospital advised that the application had been denied, and requested that arrange *528 ments be made for payment of the outstanding balance for services rendered by the hospital and arrangements be made for discharge planning. It should also be mentioned that the witness failed to produce certain documents, pursuant to court order, at the time of his testimony. In sum, this court has concluded that Mr. Levin’s son is either unable or unwilling to exercise the authority granted to him under the power of attorney, and also entertains serious doubts as to his ability to make future decisions pursuant to the health care proxy.
One of the factors, which a court must take into consideration before appointing a guardian, is the previous execution of a power of attorney pursuant to the General Obligations Law, and appointment of a health care proxy, under the Public Health Law. (Mental Hygiene Law § 81.19 [d].) Indeed, one of the enumerated responsibilities of a court evaluator is to provide information to the court concerning whether or not an AIP has made any appointments or delegations under a power of attorney, health care proxy, or living will. (Mental Hygiene Law § 81.09 [c] [5] [xi].) Furthermore, although the powers, which may be granted to a guardian, are extremely broad, a guardian is expressly prevented from revoking any such appointment or delegation. (Mental Hygiene Law § 81.22 [b] [2].) As indicated by the Law Revision Commission Comments, made in conjunction with this section of article 81, the prohibition against a guardian revoking a power of attorney or health care proxy was "[cjonsistent with New York State’s policy of encouraging the creation of durable powers and springing durable powers of attorney, Do Not Resuscitate Orders, Health Care Proxies, and living wills”. (Law Rev Commn Comments, reprinted following McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.22, at 262.)
The power of attorney granted to Mr. Levin’s son was the statutory short form, as provided for in article 5 of the General Obligations Law. This document included a statement that " '[tjhis power of attorney shall not be affected by the subsequent disability or incompetence of the principal’ ”. (General Obligations Law § 5-1601 [1].) Accordingly, under General Obligations Law § 5-1601 (1), the authority of an attorney-in-fact, named therein, would not be revoked or terminated by any subsequent disability or incompetence. In the event that "a committee or conservator thereafter is appointed for such principal”, General Obligations Law § 5-1601 (2) directs that the attorney-in-fact account to the committee or conservator. This particular section of the General *529 Obligations Law should also apply to guardians, appointed under article 81 of the Mental Hygiene Law, inasmuch as the Legislature has provided that "[w]herever a statute uses the terms conservators or committees, such statute shall be construed to include the term guardian notwithstanding the provisions of such article unless the context otherwise requires.” (L 1992, ch 698, §4, eff Apr. 1, 1993, as amended.) However, General Obligations Law § 5-1601 (2) further grants a committee or conservator (guardian) the same power as a principal "to revoke, suspend or terminate all or any part of such power of attorney”, and this, of course, is in direct conflict with the provisions of Mental Hygiene Law § 81.22 (b) (2).
The reasons for enactment of article 81 of the Mental Hygiene Law, including the legislative and judicial history, calls into question the continued viability of certain aspects of General Obligations Law § 5-1601, and in particular, the authority of a guardian to revoke a power of attorney. The Court of Appeals has ruled that the authority of a conservator, appointed under former article 77 of the Mental Hygiene Law, was limited to the management of a conservatee’s property, as distinguished from making decisions involving the person, such as making a commitment to a nursing home. (Matter of Grinker [Rose], 77 NY2d 703 [1991].) In rendering this decision, the Court further emphasized that appointment of a conservator for the property is not justified unless there is a causal connection between an individual’s mental condition and the inability to manage property affairs. Subsequently, the Legislature, by enactment of article 81, eliminated the "diagnostic labels”, required under former articles 77 and 78, and defined incapacity in terms of a person’s functional limitations or inability to provide for personal needs and/or property management. (See, Law Rev Commn Comments, reprinted following McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.02, at 225.) The Legislature recognized that it was desirable to make available the least restrictive form of intervention for persons with incapacities, and the powers of a guardian should be tailored to the individual needs of such persons. (Mental Hygiene Law § 81.01.)
Based upon the rationale behind enactment of article 81, the terms "disability” or "incompetence” may no longer have relevance in terms of an appointment of a guardian under article 81 of the Mental Hygiene Law. At the very least, a guardian, who, for example, is appointed to exercise minimal *530 intervention in a person’s management of their property affairs, should not automatically be accorded the power to revoke a power of attorney. Accordingly, such authority has been withheld under Mental Hygiene Law § 81.22 (b) (2), and any guardian, appointed in the pending case, could not revoke the power of attorney previously granted to Mr. Levin’s son. Nevertheless, it would be an anomaly if a guardian were precluded from making responsible decisions for the preservation of a person’s property because the same decision making authority had been previously granted, under a power of attorney, and the grantee thereof is unwilling or unable to fulfill his or her duties.
In the pending case, the court directs that the temporary guardian be appointed as permanent guardian for the management of Mr. Levin’s property for the remainder of his life. Although the guardian would be unable to revoke the previously executed power of attorney, there should be nothing to prevent a court of competent jurisdiction to exercise its inherent powers to set aside such power of attorney under appropriate circumstances. Accordingly, the court further directs that the appointment of Mr. Levin’s son, under the power of attorney and the delegation of authority to him be revoked. The guardian should be granted the same powers, concerning property management, as contained in this previously executed power of attorney. In addition, the guardian is specifically authorized to apply for government and private benefits, which may be available for payment of Mr. Levin’s health care at the hospital and otherwise. (Mental Hygiene Law § 81.21 [a] [12].) Furthermore, the guardian is authorized and directed to commence a proceeding to discover property of Mr. Levin which may have been withheld by his son or others, including, but not limited to the proceeds from the sale of real property. (Mental Hygiene Law § 81.44.)
Although the court has directed that the power of attorney be revoked, as part of this proceeding, the same result should not necessarily follow concerning the health care proxy. Generally, a guardian appointed for the personal needs of an incapacitated person may be granted broad powers, including, but not limited, to giving consent or refusing to permit routine or major medical treatment and placement in a nursing home or residential care facility. (Mental Hygiene Law § 81.22 [a] [8], [9].) Again, however, like the prohibition against revocation of a power of attorney, a guardian may not revoke a health care proxy, executed pursuant to Public Health Law *531 § 2981. (Mental Hygiene Law § 81.22 [b] [2].) However, unlike the General Obligations Law, involving powers of attorney, there is express statutory authority for the commencement of a special proceeding, pursuant to CPLR article 4, to have an agent of a health care proxy removed "on the ground that the agent (a) is not reasonably available, willing and competent to fulfill his or her obligations under this article”. (Public Health Law § 2992 [2].) Among the authorized petitioners for commencing such a proceeding would be a conservator or committee of the principal, and for reasons hereinbefore discussed, this should also include a guardian appointed under article 8l of the Mental Hygiene Law. Accordingly, the guardian appointed in the pending proceeding is authorized to commence a special proceeding, under Public Health Law § 2992, to remove Mr. Levin’s son as the agent on the health care proxy.