OPINION OF THE COURT
Daniel F. Luciano, J.
The petitioner, John B. Wingate, Commissioner of the Suffolk County Department of Social Services, commenced this proceeding pursuant to article 81 of the Mental Hygiene Law seeking the appointment of a guardian for the property management and personal needs of Grace Kern.
*110 A cross petition has been served and filed by Sonja Gruenheid who seeks to have herself appointed as the guardian of Grace Kern.
Grace Kern is 83 years of age, having been born on April 1, 1912. Until her recent placement in the Patchogue Nursing Center she had resided in her home with her husband, Pius Kern.
There can be no question that the clear and convincing evidence in this case establishes that Grace Kern is an incapacitated person. Her physical condition appears to be accurately described in paragraphs 4 (e) and (f) of the petition:
"Mrs. Kern’s functional level is that she is wheel chair bound, cannot hold up her head, her right side is paralyzed and both legs are constricted. She is unable to speak, and only makes grunting noises. Feeding is very difficult as Mrs. Kern’s ability to swallow was affected by a stroke. All of her food is pureed or liquid. Mrs. Kern is taken out of her bed a few hours every day to help with circulation and healing of bed sores which were recently observed by caseworker on both sides of her body.
"Mrs. Kern is extremely frail. She had a stroke which left her paralyzed on her right side. She is aphasic and cannot speak, and she has a seizure disorder which is under control. She also has hypertension, noninsulin dependent diabetes mellitus, chronic urinary tract infections, and arteriosclerotic heart disease. She is incontinent of stool and has a Foley catheter. She needs positioning and turning and has a history of bed sores.”
With respect to her mental capabilities the unrefuted assertions of Aurene C. Alasasbas, M.D., in an affirmation dated September 21, 1994 annexed to the petition are that:
"The patient is unable to comprehend and manage her daily functions. She requires full time assistance. Mrs. Kern is unable to manage her affairs and make decisions regarding her property and financial status. She is also unable to make medical care decisions and decisions as to where she should live.
"Her prognosis is poor.”
Since the unrefuted proof makes it clear that Grace Kern is a person in need of assistance in the management of her property and personal needs the essential issue is who should be empowered to serve in that capacity.
*111 As noted above, Sonja Gruenheid seeks to be appointed as the guardian for Grace Kern.
Sonja Gruenheid is not related to Grace Kern or Pius Kern. She is, however, a longtime acquaintance of Grace Kern and Pius Kern and alleges that Grace Kern was like a second mother to her.
That long-term relationship, asserted to be of some 40 years, has continued leading to the following events described in Sonja Gruenheid’s cross petition in paragraphs 6 (b)-(h) as follows:
"b. The Cross-Petitioner is named Power-of-Attorney pursuant to Article 5, title 15 of the New York General Obligations Law in a valid instrument signed by grace kern on May 27, 1988. This instrument is attached hereto * * *
"c. The Cross-Petitioner is joint tenant with grace kern on her bank accounts.
"d. The Cross-Petitioner is named in the Last Will and Testament of grace kern as the residuary beneficiary, should her husband, Pius kern, predecease her.
"e. The Cross-Petitioner is the transferee of the real property of grace kern (which was held jointly with plus kern).
"f. The Cross-Petitioner is the named beneficiary of the life insurance of grace kern.
"g. The Cross-Petitioner has assisted grace kern with all of her financial matters for several years.
"h. The Cross-Petitioner has assisted grace kern with all of her personal needs for several years, including regular visits to her home to clean her, feed her, dress her, change her and maintain her well-being as best as she was capable. The Cross-Petitioner took on this endeavor while at the same time tending to her own career and family.”
The referenced power of attorney is in the statutory short form (General Obligations Law § 5-1501). The question as to whether or not Grace Kern was without sufficient mental capacity to knowingly and meaningfully execute it on May 27, 1988 was not an issue before the court. A review of the document, however, reveals that it does not contain language providing for the agent’s authority to continue in the event of subsequent disability or incompetence in accordance with section 5-1601 (1) of the General Obligations Law. Accordingly, the authority of the agent under the power of attorney would not survive Grace Kern’s subsequent incompetence. (See, 2 NY *112 Jur 2d, Agency and Independent Contractors, § 48; Matter of Ciervo, 124 AD2d 583.)
In a proceeding commenced pursuant to article 81 of the Mental Hygiene Law, however, the court is not called upon to determine whether an individual is competent or incompetent. (See, Mental Hygiene Law §§ 81.01, 81.02; Law Rev Commn Comments [2] [B], McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.02, at 299.) A finding of incapacity does not establish that a person is incompetent. (See, Mental Hygiene Law § 81.29 [a].) Thus, just as the finding of a "substantial impairment” under former article 77 of the Mental Hygiene Law concerning conservatorships did not establish incompetence warranting a court’s direction to void a power of attorney (Matter of Schilling, 201 AD2d 568) neither does a finding of incapacity alone support a direction voiding a power of attorney.
It might be concluded, therefore, that what is required to effectuate a voiding of a power of attorney is a separate finding that the incapacitated person does not have the capability of making a reasoned determination as to whether an attorney-in-fact should continue to have the authority to represent the principal’s interests so as to warrant voiding the power of attorney. While this may seem appropriate, a review of Mental Hygiene Law article 81, however, reveals that such a conclusion cannot be free of doubt.
Section 81.22 of the Mental Hygiene Law (powers of guardian; personal needs) provides, in part:
"(b) No guardian may * * *
"2. revoke any appointment or delegation made by the incapacitated person pursuant to sections 5-1501, 5-1601 and 5-1602 of the general obligations law”.
The Law Revision Commission Comments regarding this provision are not expansive, stating only: "Consistent with New York State’s policy of encouraging the creation of durable powers and springing durable powers of attorney * * * Article 81 specifically prohibits a guardian from revoking any such advance directive.” (Law Rev Commn Comments, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.22, at 343.)
Section 81.29 of the Mental Hygiene Law (effect of the appointment on the incapacitated person) provides, in part: "(d) If the court determines that the person is incapacitated and appoints a guardian, the court may modify, amend, or *113 revoke any previously executed appointment, power or delegation under section 5-1501, 5-1601 or 5-1602 of the general obligations law * * * made by the incapacitated person prior to the appointment of the guardian if the court finds that the previously executed appointment, power, delegation * * * was made while the person was incapacitated.”
The Law Revision Commission Comments regarding this provision are simply that: "As indicated in section 81.22 (b) (2) the guardian may not revoke powers of attorney * * * however, the court may modify, amend or revoke any previously executed appointment, power or delegation * * * if the court finds that the person took such action while incapacitated.” (Law Rev Commn Comments, op. cit., Mental Hygiene Law § 81.29, at 350.)
In Matter of Rochester Gen. Hosp. (Levin) (158 Misc 2d 522) the Supreme Court of Monroe County had the opportunity to consider the effect of the finding of incapacity and the appointment of a guardian upon a previously executed durable power of attorney.
A durable power of attorney is a power of attorney, such as that as may be granted pursuant to section 5-1501 of the General Obligations Law, which, as provided in section 5-1601 of the General Obligations Law "contains the words 'This power of attorney shall not be affected by the subsequent disability or incompetence of the principal’ or words of similar import showing the intent of such principal that the authority conferred shall be exercisable notwithstanding his subsequent disability or incompetence.”
Considering such a durable power of attorney in Matter of Rochester Gen. Hosp. (Levin) (supra, at 529-530), the court said: "Based upon the rationale behind enactment of article 81, the terms 'disability’ or 'incompetence’ may no longer have relevance in terms of an appointment of a guardian under article 81 of the Mental Hygiene Law. At the very least, a guardian, who, for example, is appointed to exercise minimal intervention in a person’s management of their property affairs, should not automatically be accorded the power to revoke a power of attorney. Accordingly, such authority has been withheld under Mental Hygiene Law § 81.22 (b) (2), and any guardian, appointed in the pending case, could not revoke the power of attorney previously granted to Mr. Levin’s son.”
Without citation to section 81.29 (d) of the Mental Hygiene Law the court concluded that "[although the guardian would *114 be unable to revoke the previously executed power of attorney, there should be nothing to prevent a court of competent jurisdiction to exercise its inherent powers to set aside such power of attorney under appropriate circumstances.” (158 Misc 2d, at 530, supra.) The court thereupon directed that the appointment of the incapacitated person’s son under a power of attorney and the delegation of authority to him be revoked.
Under the facts of the case before it, in which the incapacitated person’s son had demonstrated little diligence or interest in meeting the needs of his incapacitated father, the result reached by the court seems appropriate.
The question arises, however, if the court was possessed of the inherent authority which it exercised in revoking the power of attorney, what is the meaning of Mental Hygiene Law § 81.29 (d) which purports to limit the court’s authority to revoke such a power of attorney to those cases in which the power of attorney was executed while the person was incapacitated.
Whether this court would concur with the determination of Justice Raymond E. Cornelius in Matter of Rochester Gen. Hosp. (Levin) (supra) is a question on which judgment may now be reserved inasmuch as the issue before the court is somewhat distinct as it involves a power of attorney which does not include the requisite language rendering it a durable power of attorney.
The doubt engendered by the two statutory provisions, Mental Hygiene Law § 81.22 (b) and § 81.29 (d), becomes apparent upon close examination.
The referenced section 5-1501 of the General Obligations Law is the statute embodying the statutory short form power of attorney. Section 5-1601 is the provision allowing for the creation of the durable power of attorney and section 5-1602 provides for the so-called springing durable power of attorney. In effect sections 5-1601 and 5-1602 involve enhancements or modifications of the simple power of attorney.
In addressing the public policy question of whether a person should have the right to have his or her wishes as to the appointment of an attorney-in-fact survive a future disability or incompetence, it is logical (without addressing the merits of the policy decision) that the Legislature would specifically provide that the individual’s choice of an attorney-in-fact, purposefully made in contemplation of having it survive such person’s future disability or incompetence, is not to be tarn *115 pered with by the court or a Mental Hygiene Law article 81 guardian.
But one apparent legislative directive does not seem logical. A power of attorney not enhanced with the durability provision of General Obligations Law § 5-1601 or § 5-1602 pursuant to previously enacted law would terminate upon the principal becoming incompetent. Pursuant to what now seems to be the law such an unenhanced power of attorney would be deemed to survive even after a formal judicial finding upon clear and convincing evidence in a proceeding commenced pursuant to article 81 of the Mental Hygiene Law that the incapacitated person does not have the mental ability to oversee or pass judgment upon the acts of an attorney-in-fact who was never granted authority which was intended to survive the principal’s future disability or incompetence. To conclude that section 81.22 (b) (2) and section 81.29 (d) of the Mental Hygiene Law should be construed to prevent the court from formally declaring void a simple power of attorney after a judicial proceeding in which the principal’s inability to supervise his or her agent has become irrefutably clear is a construction which seems inconsistent with law, logic or sound public policy.
First, that construction would obviate the need for the specific inclusion of the durability or springing durability language for which sections 5-1601 and 5-1602 of the General Obligations Law provide.
Second, it might be the case that notwithstanding that it might be ineluctably clear to the court that the appointment of a guardian was necessary, the court could not set aside a power of attorney purporting to provide powers to an attorney-in-fact conflicting with those of the guardian. Further, there is no reasonable basis to conclude that a finding of incompetence sufficient to void a power of attorney should be had in a separate judicial proceeding which does not incorporate all the statutory and due process safeguards which are provided to an alleged incapacitated person in a Mental Hygiene Law article 81 proceeding.
It is, moreover, wholly unclear to this court what public policy consideration is served by leaving doubt as to the authority of an attorney-in-fact in dealing with third persons when the seemingly simple expedient of having the power of attorney formally declared void by the Mental Hygiene Law article 81 court is otherwise available.
*116 Finally, such a construction of the statutes would likely be contrary to the intention of an incapacitated person who may have deliberately chosen not to create a durable or springing durable power of attorney.
Despite the seemingly clear logic which leads to the conclusion that a simple power of attorney should not be beyond the authority of the court to declare void after a finding, in a Mental Hygiene Law article 81 proceeding, of one’s inability to oversee an agent’s activities, there remains the problem of the literal language of section 81.22 (b) (2) and section 81.29 (d) which seems to provide for exactly that illogical result. However, "[t]he letter of a statute is not to be slavishly followed when it leads away from the true intent and purpose of the Legislature or leads to conclusions inconsistent with the general purpose of the statute or to consequences irreconcilable with its spirit and reason; and statutes are not to be read with literalness that destroys meaning, intention, purpose or beneficial end for which the statute has been designed.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 111 [footnotes omitted].)
The more likely intention of the Legislature, it seems to this court, is that the said section 81.22 (b) (2) and section 81.29 (d) of the Mental Hygiene Law were intended to restrict the power of a guardian or the court in revoking a General Obligations Law § 5-1501 power of attorney which has been enhanced or modified in a manner authorized by section 5-1601 or section 5-1602 of the General Obligations Law. The court concludes that these Mental Hygiene Law statutory provisions were not intended to affect the existing law governing simple powers of attorney, or the power of the court to revoke a simple power of attorney after a formal finding in a Mental Hygiene Law article 81 proceeding, upon the facts established by clear and convincing evidence, that the principal has been incapacitated in such a manner or to such a degree that the voiding of a previously executed power of attorney is appropriate.
An additional point is worthy of discussion. It is stated in 2 New York Jurisprudence 2d, Agency and Independent Contractors (op. cit., at 501) that "[i]t is the general rule that the insanity of the principal or agent terminates an agency which is not coupled with an interest, or, at least, suspends it during the period of incapacity.” (Footnotes omitted.) Section 81.22 (b) (2) and section 81.29 (d) of the Mental Hygiene Law do not speak of any limitation upon the guardian or the court to *117 "suspend” the power of attorney during the period of incapacity. An argument could be made, therefore, that the power of attorney could be suspended by the guardian or the court during the period of incompetency without the necessity of finding any conflict between the literal language of the statutes and the logical construction of them. While this could serve as a route to avoiding the perceived conflict it is merely putting form over substance.
A person found to be incapacitated pursuant to article 81 of the Mental Hygiene Law may upon a later application be found to have been able to exercise some or all of the powers necessary to provide for personal needs or property management. (Mental Hygiene Law § 81.36.) If a power of attorney has been revoked, rather than merely suspended, the person who has recovered sufficient capacity is then free to execute a new power of attorney as he or she may be advised. Thus, the result may be precisely the same as it would have been had the power of attorney merely been suspended. Moreover, since the simple reality is that in the overwhelming majority of cases a person judicially found to be incapacitated will not regain capacity, a suspended power of attorney would generally be as effectively terminated as a revoked power of attorney.
In addition, the literal preclusion of the power to modify the power of attorney might be construed as including a preclusion of the power to suspend the power of attorney since a suspension involves a modification of the terms of the power of attorney which purport to give it continuing affect.
Moreover, if the Legislature had intended to reserve to the court or the guardian only the limited power to suspend a power of attorney one would assume that such an intention would have been reflected by the simple expedient of so stating.
Accordingly, the court concludes that the power of attorney executed by Grace Kern on May 27, 1988 appointing Sonja Gruenheid as her attorney-in-fact is now terminated and that any acts done under its authority since the date of Grace Kern’s debilitating stroke or seizure in January 1993 are voidable.
In view of this conclusion and the court’s finding that Grace Kern is an incapacitated person the next matter to be addressed is who should be appointed to serve as the guardian for Grace Kern.
*118 Grace Kern’s only natural child is deceased. The record is clear that 91-year-old Pius Kern is not a suitable choice for guardian and there is no indication of any other relative available to serve as the guardian.
Sonja Gruenheid is a person long known to Grace Kern and Pius Kern. She purportedly is a person well positioned to be familiar with the personal preferences of Grace Kern.
The court, however, is constrained to express its concern over what is both an apparent, and potentially, very real conflict of interest which would be presented if the court determined that Sonja Gruenheid should be appointed the guardian for the property management and personal needs of Grace Kern.
The cross-examination of Sonja Gruenheid revealed that subsequent to Grace Kern’s debilitating stroke or seizure in January 1993, Sonja Gruenheid received a transfer of over $300,000 from Pius Kern which was invested in a Prudential Securities account solely in Sonja Gruenheid’s name.
In addition, Sonja Gruenheid transferred $11,000 from a bank account funded with Grace Kern’s funds, which had been in the joint names of Grace Kern and Sonja Gruenheid into an account in Sonja Gruenheid’s name only.
The court takes note of the fact that Sonja Gruenheid began to expend those funds to pay for Grace Kern’s nursing home care, but only after this proceeding was commenced by the Suffolk County Department of Social Services.
In 1991 Sonja Gruenheid used her power of attorney to transfer $10,000 of Grace Kern’s money for the benefit of Sonja Gruenheid’s daughter to facilitate an anticipated purchase of a condominium. This was allegedly done with Grace Kern’s knowledge and consent. Ultimately, $8,500 of this sum was returned, and $1,500 purportedly retained as a gift from Grace Kern, to allow Sonja Gruenheid to construct a deck on her home. According to Sonja Gruenheid, the deck allegedly was to benefit Grace Kern on her visits to Sonja Gruenheid’s home by improving her accessibility to the house.
When it is recalled that for a fiduciary "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is * * * the standard of behavior” (Meinhard v Salmon, 249 NY 458, 464), these actions, which are colorably inconsistent with fiduciary duties, are sufficient to give pause.
While Sonja Gruenheid may, in fact, have at all times acted honorably and with no intent to profit at the expense of Grace *119 Kern or Pius Kern, the court’s responsibility is to give primary consideration to the protection of the rights and interests of the alleged incapacitated person.
Moreover, to put Sonja Gruenheid in a position wherein she may be both the grantor and recipient of Grace Kern’s property is to create a situation in which the appearance of, and potential for actual impropriety are manifest. Any decision she might make by which she could enjoy an immediate or future pecuniary benefit would be subject to scrutiny and doubt. The court should not knowingly allow a state of events to evolve that will burden Sonja Gruenheid with the specter of future criticism, and create doubt and conflict about decisions intended to benefit Grace Kern.
To assure the well-being of Grace Kern and the propriety of the management of Grace Kern’s property, both in appearance and in fact, Nancy Burner, Esq. of 310 Hallock Avenue, Port Jefferson Station, New York 11776 (516) (928-8000) is appointed the guardian for the personal needs and financial and property management of Grace Kern with all the power set forth in section 81.21 (a) and section 81.22 (a) of the Mental Hygiene Law. Additionally, the guardian shall have the specific duty of determining what funds presently held in the name of Sonja Gruenheid, or otherwise maintained under Sonja Gruenheid’s direct control, are the property of Grace Kern and securing those funds to be held as a guardianship asset for the benefit of Grace Kern.
In addition, the guardian shall investigate the circumstances surrounding the purported gift of $1,500 for the construction of a deck on Sonja Gruenheid’s home. Pending that determination, the statement to be filed pursuant to Mental Hygiene Law § 81.20 (a) (6) (vi) shall include a potential interest of Grace Kern in the real property of Sonja Gruenheid to which the deck constructed with the purported gift of $1,500 was affixed.
The determination of whether an application should be made to the court for the authority to dispose of any of Grace Kern’s property, real or personal, in the furtherance of "Medicaid planning” shall be left to the discretion of the guardian after a thorough review of all the surrounding facts and circumstances, and the applicable law.
The court takes this opportunity to note that since no application is before the court with respect to seeking a guardian for Pius Kern the jurisdiction of the court and the *120 power of the guardian for Grace Kern shall not extend to any property which is presently Pius Kern’s or formerly Pius Kern’s, as to which Grace Kern has no title or ownership interest. The guardian for Grace Kern shall carefully trace and distinguish the separate property of Grace Kern and Pius Kern.
With respect to personal needs, the guardian may freely consult Sonja Gruenheid, based upon her long familiarity with Grace Kern, to ascertain what might be Grace Kern’s personal preferences. The final decision, however, shall be that of the guardian only.
The guardian’s bond shall, in the first instance, be in the sum of $20,000 subject to modification after the filing of the initial report.
All counsel, the court evaluator and the guardian ad litem for Pius Kern seeking to be paid for their services herein should submit their affidavits of service and the court’s appointees should submit a form OCA-830 completed in its first 11 items and item 13 for the court’s execution.
The court defers a determination as to whether the Suffolk County Attorney as counsel for the petitioner and counsel for the cross-petitioner should be entitled to fees until submission of the proposed order and judgment.
The parties are reminded that it is the view of this court that the Suffolk County Attorney should be awarded "reasonable compensation” pursuant to Mental Hygiene Law § 81.16 (f) only in extraordinary circumstances.* The petitioner is *121 granted leave to submit such argument by way of affidavit, affirmation or memorandum of law as he may be advised in support of a request for "reasonable compensation” for the Suffolk County Attorney.
Additionally, counsel for the cross-petitioner is granted leave to submit argument in support of a claim for counsel fees.
Argument in support of or in opposition to these requests for fees should be served and filed on or prior to the date on which the order and judgment herein is noticed for settlement.

 In an unpublished decision dated Mar. 9, 1994, Matter of Brandwein (Rockwell), index No. 93-16384, this court stated, in part: "Section 81.16 (f) of the Mental Hygiene Law provides: When a petition is granted, or where the court otherwise deems it appropriate, the court may award reasonable compensation for the attorney for the petitioner, including the attorney general and the attorney for a local department of social services.”
This provision renders the cases Matter of Phyllis M. (152 Misc 2d 402) and Matter of Sabol (Yarmoff) (NYLJ, Apr. 29, 1992, at 24, col 5; see also, Matter of James AA., 188 AD2d 60), which involved applications made under former articles 77 and 78 of the Mental Hygiene Law, distinguishable from the present case. Those former articles did not expressly state that the attorneys for whom reasonable compensation could be paid included the Attorney-General and the attorney for a local department of social services.
Nevertheless, although the statutory authority now exists to award reasonable compensation for the legal services rendered by the Suffolk County Attorney, it is this court’s view that such authority does not mean that awards of reasonable compensation for the services of County Attorneys or the New York Attorney-General should be made routinely.
*121 The offices of County Attorneys and the New York State Attorney-General are publicly funded with taxpayers’ dollars. Presumably, the alleged incapacitated person in this, and in most instances, will have contributed taxes to such funding.
With these funds the office of County Attorneys and the New York State Attorney-General are given mandates to provide legal services in the public interest. Included in such mandate to the Suffolk County Attorney is the duty to provide legal representation to the Suffolk County Department of Social Services.
To award reasonable compensation for such services rendered out of the funds of Aline Rockwell constitutes a sort of double taxation upon her. In this court’s view, without some additional reason, other than the fact that the Commissioner of the Suffolk County Department of Social Services successfully prosecuted a petition to have a guardian appointed for an individual, it is unfair to such individual to require her to bear a disproportionate share of the public funding of the office of the Suffolk County Attorney.
Accordingly, the court construes section 81.16 (f) of the Mental Hygiene Law as authority to impose the cost of reasonable compensation of the Suffolk County Attorney or the New York State Attorney-General only in those instances when some unusual or compelling circumstance warrants such an imposition.