OPINION OF THE COURT
A. Gail Prudenti, J.
In this proceeding commenced pursuant to article 81 of the Mental Hygiene Law, petitioners request, inter alia, that the postpetition marriage of the alleged incapacitated person be revoked and annulled pursuant to section 81.29 (d) of the Mental Hygiene Law. A brief chronology of the material facts underlying such request is appropriate since the petitioners’ demands for such relief present this court with a question of first impression.
*686 In May of 1996, petitioners commenced this special proceeding pursuant to article 81 of the Mental Hygiene Law for a judgment appointing them coguardians of the person and property of their 84-year-old aunt, Dot E. W., an alleged incapacitated person. The petition originally returnable on July 1, 1996, was adjourned to July 22, 1996, pursuant to a stipulation executed by counsel for the petitioners, the court evaluator and an attorney who appeared for William B., the person with whom Ms. W. had been residing, and Ms. W. However, by short form order dated July 12, 1996, the court granted the joint application of the petitioners and the court evaluator for the appointment of independent counsel for Ms. W. On July 14, 1996, William B. married Dot E. W. in a civil ceremony before a retired Justice of the Town of New Berlin, Chenango County, New York.
At a conference on the adjourned date of the petition, it became apparent that Mr. B. was opposed to the appointment of the petitioners as coguardians of his wife. However, counsel did agree to the entry of an order restraining the financial institutions at which Ms. W.’s liquid assets were deposited and to the appointment of her counsel as temporary guardian with limited powers over her person and property. Orders providing for such relief were entered on August 12 and August 23, 1996. Meanwhile, Mr. B. filed a cross petition seeking his appointment as guardian of the personal needs of his wife and an independent person as guardian of her property. Nevertheless, by September of 1996, Mr. B. and Ms. W. were no longer residing together. He returned to his home in New Berlin, New York, while Ms. W. remained at her home in Hampton Bays where she was cared for by local physicians and home health care providers retained by her temporary guardian.
By supplemental order to show cause dated September 12, 1996, petitioners were granted leave to serve a supplemental petition seeking, among other things, a judgment "revoking and annulling” the July 14, 1996 marriage contract between Dot E. W. and William B. pursuant to section 81.29 (d) of the Mental Hygiene Law. Underlying such request were allegations that Ms. W. was incapacitated on the date of the marriage and thus lacked the mental capacity to understand the nature and consequences of the marriage.
Pending the return date of the supplemental petition, counsel for Mr. B. moved for an. order granting him leave to withdraw pursuant to CPLR 321, which application was granted by short form order dated October 31, 1996. The hear *687 ing on the petition, cross petition and supplemental petition was adjourned to December 1996 to afford Mr. B. time to retain new counsel and thereafter to January 1997 due to the unavailability of Ms. W.’s counsel and temporary guardian.
On January 31, 1997, a hearing was held on all pending applications at which the petitioners adduced proof in support of their petition and supplemental petition. William B., who failed to appear by new counsel in accordance with the directives contained in the court’s October 31, 1996 order, made no further appearances. Nor did he attend the hearing despite being provided with ample notice sent by the court and petitioners’ counsel, receipt of which was confirmed by the court evaluator’s telephone conversations with Mr. B. prior to the hearing.
At the hearing conducted on January 31, 1997, the petitioners called 10 witnesses in support of their demands for relief including Ms. W.’s current physician, a psychiatrist retained as a medical expert by the petitioners, home health care providers, a banker and relatives of Ms. W. Although present in the courtroom during the course of the hearing, Ms. W. was unable to meaningfully participate therein due to her physical infirmities and diminished cognitive abilities.
The testimony established that Ms. W. had been married for nearly 60 years to Wallace W. Mr. and Mrs. W. were a childless couple who resided most of their life together in Westchester County. They moved to Hampton Bays in the late 1970’s upon Mr. W.’s retirement. After Wallace W.’s death in 1992, Ms. W. continued to reside in their Hampton Bays home, but her physical and mental condition began to deteriorate shortly thereafter.
In September of 1993, Ms. W. was found on the floor of her Hampton Bays residence by petitioner, Jayne Johnson, who immediately arranged Ms. W.’s transport to Southampton Hospital at which she was treated for a period in excess of three weeks. Ms. W. was diagnosed as having a myriad of physical maladies including a severe gastric ulcer, gastritis, rib fractures, chronic arterial fibrillation, cerebral atrophy, Wernicke-Korsakoff’s psychosis, and alcohol dependency syndrome. On October 18, 1993, Ms. W. was released to a local nursing home. She was discharged therefrom in January of 1994, whereupon she returned to her home in Hampton Bays and was assisted thereat by home health care providers.
In or about the spring of 1994, William B., a high school acquaintance of Ms. W., began corresponding with her. Although *688 Mr. B. resided in New Berlin, New York, a rural upstate community located in Chenango County, Ms. W. began to visit him. By the fall of 1994, Ms. W. and Mr. B. resided together alternating between his home in New Berlin and her home in Hampton Bays.
In May of 1995, Ms. W. suffered an acute embolic stroke and was treated at Southampton Hospital. Discharge therefrom was conditioned upon 24-hour supervision. The diagnosis of her treating physicians indicated that Ms. W. had apparently suffered a prior stroke. The diagnosis of cerebral atrophy and Wernicke-KorsakofFs psychosis was confirmed and manifested itself in confused and mentally impaired behavior. Ms. W. was again hospitalized in the fall of 1995 in Cooperstown, New York, for congestive heart failure. Upon discharge, she returned to Mr. B.’s residence in New Berlin.
By January of 1996, Ms. W.’s physician directed that skilled nursing care be provided by reason of her deteriorating physical condition and her confused mental state. In May of 1996, she was diagnosed with dementia. Such diagnosis was consistent with the testimony of petitioner’s psychiatric expert who examined Ms. W. in September of 1996. He testified that Ms. W. was then suffering from dementia and in his opinion was suffering therefrom on the date of her marriage to William B. in July of 1996. While his opinion of antecedent incapacity was "retroacting”, it was confirmed rather than contradicted by other direct proof adduced at the hearing (cf., Rattray v Huntting, 11 AD2d 785; Broat v Broat, 18 NYS2d 709).
The testimony of other witnesses called by the petitioners established that in or about the fall of 1995, Mr. B. began to engage in a course of conduct which isolated Ms. W. from her friends, family and property. Such conduct included the disconnection of phone service to his New Berlin residence, the non-admittance of home health care service providers who visited Ms. W., the cancellation of skilled nursing services, and various attempts to access Ms. W.’s financial resources. By 1996, Mr. B. was in exclusive control of Ms. W.’s person. In the spring of 1996, he undertook to have himself appointed by Ms. W. as her attorney-in-fact. On May 3, 1996, Ms. W. purportedly executed a revocation of a 1993 power of attorney in favor of the petitioners and purportedly executed a new power of attorney in favor of Mr. B. on June 4, 1996.
At the conclusion of the hearing, this court found that Ms. W. was an incapacitated person as that term is defined in section 81.02 (b) of the Mental Hygiene Law and issued the find *689 ings contemplated by Mental Hygiene Law § 81.15 (b) and (c). The court appointed petitioners as coguardians of the person and property of their aunt and dismissed the cross petition filed by William B. Additionally, the court revoked the power of attorney executed by Ms. W. on June 4, 1996, pursuant to Mental Hygiene Law § 81.29 (d), but reserved decision on petitioners’ demands for a judgment revoking and annulling the July 14, 1996 marriage of Ms. W. to Mr. B.
Article 81 of the Mental Hygiene Law was enacted in 1992 after an extensive study of the statutes governing fiduciary appointments for incapacitated persons was undertaken by the New York State Law Revision Commission. Although its initial purpose was the revision of former article 77 (conservatorship) and former article 78 (committeeship) of the Mental Hygiene Law, the Commission ultimately found that an entirely new statutory system to provide for the needs of disabled persons was necessary. Such finding was predicated upon the Commission’s conclusion that former articles 77 and 78 of the Mental Hygiene Law failed to provide relief sufficient to meet the needs of persons who, while neither incompetent nor substantially impaired under Mental Hygiene Law former articles 77 and 78, are nevertheless unable to provide for the activities of daily living by reason of functional limitations (see, Recommendation of Law Rev Commn to 1992 Legislature, 1993 McKinney’s Session Laws of NY, at 2025). Rather than amend the existing committeeship / conservatorship statutes, the Commission proposed their repeal and the adoption of a new statutory system of guardianship to be set forth in article 81 of the Mental Hygiene Law.
In 1992, the Legislature adopted the position of the Law Revision Commission by repealing former articles 77 and 78 of the Mental Hygiene Law and enacting the proposed guardianship statute as article 81 of the Mental Hygiene Law. As evidenced by the legislative declarations set forth in Mental Hygiene Law § 81.01, the primary objective of article 81 is to provide a system of fiduciary appointments for persons who are unable to provide for the activities of daily living by reason of functional limitations. Courts presiding over article 81 proceedings are thus charged with tailoring each guardianship to meet the needs of the individual, limiting fiduciary encroachment into the individual’s daily life and decision-making capabilities to the least restrictive form of intervention. Determinative of that which constitutes the least restrictive form of intervention is the functional level of the individual *690 which is defined as the ability of the individual to provide for personal needs and/or ability with respect to property management (Mental Hygiene Law § 81.03 [b]).
To effectuate these objectives, various provisions of article 81 provide procedural safeguards unknown under former articles 77 and 78 (see, e.g., Mental Hygiene Law §§ 81.07, 81.10, 81.11, 81.14, 81.16, 81.23). Designed to assure that the individual’s constitutional rights are fully protected and to encourage such individual’s participation in the proceedings to the extent his or her functional level will permit, article 81 employs an advocacy approach to guardianship in which traditional aspects of the adversarial process predominate.
While not among the targeted group of persons at whom the statute is aimed, persons with functional levels so low that they would have qualified for fiduciary appointments under former articles 77 and 78 are among the persons for whom an article 81 guardian may be appointed. Guardianship proceedings concerning these persons are usually uncontested with respect to the issue of necessity (Mental Hygiene Law § 81.02) and the meaningful participation of such persons in the proceeding is usually precluded by reason of the severity of their incapacitation. In such proceedings, the advocacy approach to guardianship gives way to the traditional best interests approach. Such approach is deeply rooted in the parens patriae power of the State from which the court’s jurisdiction over incapacitated persons and their property is derived. Pursuant thereto, the court serves as the protector of the disabled person before it and is thus empowered to take all action reasonably necessary to promote the best interests of such individual.
To foster judicial resort to the best interests approach to guardianship, article 81 provides that: (1) a neutral court evaluator be appointed in every proceeding (Mental Hygiene Law § 81.09); (2) the appearance of the individual at the hearing on the petition may be dispensed with where such individual is incapable of attending or unable to meaningfully participate therein (Mental Hygiene Law § 81.11 [c]); (3) the rules of evidence may be waived by the court (Mental Hygiene Law § 81.12 [b]); (4) the court may appoint a temporary guardian to forestall harm to the person or property of alleged incapacitated person (Mental Hygiene Law § 81.23); and (5) the court may revoke any previously executed power, delegation, or any contract, conveyance or disposition if it appoints a guardian and finds that the individual was incapacitated when it was made *691 (Mental Hygiene Law § 81.29 [d]). Enactment of these provisions evince an intention on the part of the Legislature to codify the court’s traditional parens patriae power over severely incapacitated persons, pursuant to which the court is obligated to undertake action reasonably necessary to serve their best interests.
Upon a reading of article 81 in its entirety, this court finds that it is an affirmative, positive statute, remedial in nature, the enactment of which was intended for the protection of persons under disability and the public at large. As such, it is entitled to a liberal construction by this court (McKinney’s Cons Laws of NY, Book 1, Statutes §§ 34, 35, 321, 323).
Nevertheless, the granting of the relief demanded by the petitioners is available only upon a finding that (1) a marriage contract constitutes a contract within the meaning of Mental Hygiene Law § 81.29 (d); (2) by empowering the court to revoke any contract the Legislature intended to create a statutory right or action in favor of parties to an article 81 proceeding pursuant to which the court may annul a marriage; and (3) that the granting of such relief in the context of an article 81 special proceeding is not precluded by existing statutes or decisional law nor inconsistent with the requirements for the granting of existing remedies provided thereunder. For the reasons set forth below, this court so finds and thus grants the relief demanded in the supplemental petition.
Petitioners’ demands for revocation and annulment of the July 14, 1996 marriage are predicated upon assertions that this court is statutorily empowered to grant such relief in this article 81 proceeding pursuant to section 81.29 (d) of the Mental Hygiene Law and section 10 of the Domestic Relations Law, which provide as follows:
Mental Hygiene Law § 81.29 (d): "If the court determines that the person is incapacitated and appoints a guardian, the court may modify, amend, or revoke any previously executed appointment, power, or delegation under section 5-1501, 5-1601, or 5-1602 of the general obligations law or section two thousand nine hundred sixty-five of the public health law, or section two thousand nine hundred eighty-one of the public health law notwithstanding section two thousand nine hundred ninety-two of the public health law, or any contract, conveyance, or disposition during lifetime or to take effect upon death, made by the incapacitated person prior to the appointment of the guardian if the court finds that the previously executed appointment, power, delegation, contract, conveyance, or disposi *692 tion during lifetime or to take effect upon death, was made while the person was incapacitated.”
Domestic Relations Law § 10: "Marriage, so far as its validity in law is concerned, continues to be a civil contract, to which the consent of parties capable in law of making a contract is essential.”
Although former articles 77 and 78 contained no express provisions, unlike article 81, for the revocation of contracts executed by those lacking the capacity to contract, decisional law has long provided remedies therefor. Contracts made by persons adjudicated incompetent for whom committees were appointed were considered presumptively void (Hughes v Jones, 116 NY 67; Carter v Beckwith, 128 NY 312), while contracts of persons without committees, but of such unsound mind as to lack the requisite ability to understand the nature and consequences of the transaction, were considered voidable (Blinn v Schwarz, 177 NY 252; Finch v Goldstein, 245 NY 300; see also, Ortelere v Teachers’ Retirement Bd., 25 NY2d 196). However, by positive enactment contained in section 7 of the Domestic Relations Law, a marriage entered into by a person lacking the ability to consent thereto for want of understanding is voidable, irrespective of whether such person was an adjudicated incompetent at the time of the marriage.
That a marriage contract could be made the subject of State regulation by legislative enactment from which ordinary simple contracts are exempt, is the result of the State’s public policy interests in the status and obligations of the parties to the marriage, and the familiar relations that arise after formation of a valid marriage (Svenson v Svenson, 178 NY 54). Since the State’s interest in marriages was rooted in public policy, the courts became reluctant to exercise their constitutionally compressed, inherent, equitable jurisdiction over annulments on the grounds of lunacy or fraud after the Legislature undertook regulation of the subject of annulments in 1828 by enactment of the Revised Statutes (Griffin v Griffin, 47 NY 134; Erkenhach v Erkenhach, 96 NY 456; Fisk v Fisk, 6 App Div 432; Walter v Walter, 217 NY 439; Butler v Butler, 204 App Div 602). These statutes provided that actions to annul marriages could only be brought in accordance with the codes regulating civil procedure (see, Domestic Relations Law § 7 [former (5)]). In deference thereto, the courts pronounced that annulment actions were "purely statutory” (Stokes v Stokes, 198 NY 301, 304) and held that they could no longer assert their antecedent, equitable jurisdiction to annul marriages on *693 the grounds of lunacy or fraud (Walter v Walter, 217 NY 439, supra). Adherence to these precedents, albeit equivocal, continued notwithstanding the repeal of the exclusivity provisions of Domestic Relations Law § 7 (former [5]) in 1962, when sweeping procedural reforms that included the enactment of the CPLR were adopted (L 1962, ch 313, § 1; Romano v Romano, 19 NY2d 444).
Decisional law also resulted in judicial pronouncements that the marriage contract was sui generis, differing from ordinary contracts by reason of the status of the parties and the social institution created thereby in which the state had direct interests (Fearon v Treanor, 272 NY 268). Marriage, it was held, " 'begins by contract, and results in a status’ ” (Svenson v Svenson, 178 NY 54, 57, supra). Thus, while a marriage contract is declared a civil contract pursuant to section 10 of the Domestic Relations Law, it was found "not thereby made synonymous with the word contract employed in the common law or statutes” (Wade v Kalbfleisch, 58 NY 282, 284; see also, Walter v Walter, 217 NY 439, supra; Mohrmann v Kob, 291 NY 181).
Nevertheless, the court’s focus here is on the initial validity of the subject marriage to which the free and full consent of the parties thereto is made necessary by the express provisions of Domestic Relations Law § 10. Under these circumstances, it has been held that "our law considers marriage in no other light than as a civil contract” (di Lorenzo v di Lorenzo, 174 NY 467). Consent of parties capable in law of contracting being essential, "[a]ny lack [therein] makes the marriage void (Dom. Rel. Law, §§ 5 and 6) or voidable (L PI * * * and an action may be maintained to annul it” (Shonfeld v Shonfeld, 260 NY 477, 479; Kober v Kober, 16 NY2d 191).
Upon consideration of these precedents, current statutes including our modern procedural law with its concomitant notions of judicial economy, and upon a liberal reading of Mental Hygiene Law § 81.29 (d) in paria materia with section 10 of the Domestic Relations Law, this court finds that a marriage constitutes a contract within the meaning of Mental Hygiene Law § 81.29 (d). As such, it is subject to revocation by the court on the grounds that a party thereto for whom a guardian has been appointed was incapacitated at the time it was contracted rendering such party incapable of consenting thereto by reason of want of understanding. The proof adduced in the case at bar was sufficient to establish that on July 14, 1996, Ms. W. was incapacitated and that by reason thereof, was incapable of *694 understanding the nature, effect and consequences of her marriage to Mr. B. Such proof also was sufficient to satisfy established standards of proof necessary to annul a marriage for want of understanding (De Nardo v De Nardo, 293 NY 550; Weinberg v Weinberg, 255 App Div 366).
The court further finds that Mental Hygiene Law § 81.29 (d) confers a statutory right of action in favor of parties to article 81 proceedings, pursuant to which powers, delegations, contracts, conveyances and dispositions may be revoked or annulled. Accordingly, where the statutory conditions for revocation are satisfied and the court has properly acquired jurisdiction over necessary parties within the contemplation of CPLR 1001, such relief may be granted by judgment entered pursuant to Mental Hygiene Law § 81.16 (d). The need to resort to traditional actions at law is thus obviated (Matter of LeBovici, NYLJ, Feb. 26, 1997, at 32, col 1 [Sup Ct, Queens County, Kassoff, J.]; cf., Matter of Rochester Gen. Hosp. [Levin], 158 Misc 2d 522).
Since the statute is silent as to the procedures by which the right of action conferred by Mental Hygiene Law § 81.29 (d) may be reduced to remedy, the court is free to fashion same by adapting existing practices (McKinney’s Cons Laws of NY, Book 1, Statutes §§ 363, 364). In exercising its authority to supply all reasonably necessary incidents to the rights and powers conferred, the court should fashion a remedy that is consistent with existing law. This will assure that the court may afford complete relief to the parties.
The granting of an annulment of the marriage at issue here is not precluded by existing statutes or decisional law nor is it repugnant to the requirements imposed upon the granting of remedies provided thereunder. Indeed, a review of existing statutory remedies includes a special proceeding in which dissolution of a marriage may be obtained (Domestic Relations Law art 12). The notice and hearing requirements statutorily prescribed as necessary in all Mental Hygiene Law article 81 proceedings are consistent with the provisions of Domestic Relations Law articles 9 and 13.
However, review of existing law indicates that pursuant to Domestic Relations Law § 236 (B) (5), the court must determine the respective rights of the parties in their separate or marital property and shall provide for the disposition thereof in the final judgment in all matrimonial actions subject thereto in which a marriage is dissolved (Bernholz v Bernholz, 184 AD2d 542). That an action for annulment of any marriage is subject *695 to the mandate of Domestic Relations Law § 236 (B) (5) is now clear (DeLyra v DeLyra, 74 NY2d 872). In the instant case, the court is without any proof regarding the economic issues contemplated by Domestic Relations Law § 236 (B) (5) and is thus precluded from issuing a judgment determining the rights of the parties in their separate or marital property. Nevertheless, the absence of proof on these economic issues does not warrant denial of the relief requested by the petitioners.
While the failure on the part of the court to determine the rights of the parties in their separate or marital property has been held by the Appellate Division, Third Department, to render a judgment dissolving the marriage nonbinding, nonfinal, and without effect (Garcia v Garcia, 178 AD2d 683; Sullivan v Sullivan, 174 AD2d 862), these case authorities have been rejected by the Appellate Division, Fourth Department (Zack v Zack, 183 AD2d 382). In Zack, the Court found that the provisions of Domestic Relations Law § 236 (B) (5) requiring that a final judgment shall be rendered determining all of the respective rights of the parties, including the dissolution of the marriage and the economic issues contemplated therein, does not preclude issuance of an interlocutory divorce judgment prior to the entry of a final judgment awarding equitable distribution. Nothing precludes this court from adopting the holding of the Fourth Department in Zack v Zack (supra) as neither the Court of Appeals nor the Appellate Division, Second Department has ruled upon the issue.
The court thus finds that bifurcation of the issues of marriage dissolution and economic rights which are the subject of Domestic Relations Law § 236 (B) (5) is permissible since the court may enter an interlocutory judgment of divorce, annulment or dissolution prior to its issuance of a judgment determining economic rights of the parties to the marriage. Accordingly, issuance of this decision favorably determining the petitioners’ entitlement to a judgment annulling the subject marriage without a concomitant determination of the parties’ economic rights does not effect a violation of the mandate of Domestic Relations Law § 236 (B) (5). If necessary, the court will direct a severance and the entry of an interlocutory judgment annulling the subject marriage pending determination of the economic rights of the parties under Domestic Relations Law § 236 (B) (5). In the interim, the economic issues not decided herein are continued pending the submission of proof on such issues at an inquest to be scheduled as set forth below (Bernholz v Bernholz, 184 AD2d 542, supra).
*696 In view of the foregoing, an inquest on the economic issues within the purview of Domestic Relations Law § 236 (B) (5) shall be heard on April 4, 1997 at 9:30 a.m. at the Surrogate’s Court, 320 Center Drive, Riverhead, New York. Counsel for the petitioners shall, within 15 days of the date hereof, serve a notice of inquest personally upon Mr. B. and by mail upon all other appearing parties.