OPINION OF THE COURT
H. Patrick Leis III, J.
The within proceeding highlights the difficulties and limitations inherent in consent guardianships. On September 24, 2012, Mental Hygiene Legal Services (MHLS) filed a motion (Oil) for an order discharging the guardian of James D., a 66-year-old man who had consented to the appointment of a guardian. By order to show cause (012) dated October 9, 2012, Robert Isler, Mr. D.’s successor guardian, moved for an order determining Mr. D. to be incapacitated and appointing a guardian over his objection. A cross motion (013) for an order discharging Mr. Isler as the successor guardian was filed by MHLS on October 16, 2012.
In his application, Mr. Isler seeks an order expanding his property management powers to include, inter alia, the powers: (1) to notify all credit reporting agencies that Mr. D. is an incapacitated person; (2) to direct that no additional credit should be extended to Mr. D. without the consent of the successor guardian; and, (3) to cancel any credit cards already opened by Mr. D. In addition, Mr. Isler asks that his personal needs powers be expanded to include, inter alia, the power: (1) to exclude or remove anyone from Mr. D.’s home who, in Mr. Isler’s opinion, is interfering with the care plan in place; (2) to retain a geriatric care manager; and (3) to place Mr. D. in a nursing home.
A review of the procedural history of this guardianship reveals the following. In 2009, Lorraine Buffalino, Mr. D.’s friend and an employee of his financial advisor, petitioned the court for a guardian to be appointed for Mr. D. After the court determined that Mr. D. possessed the requisite capacity to agree and upon Mr. D.’s consent to the guardianship, Ms. Buffalino was appointed guardian (see Mental Hygiene Law § 81.15). In January of 2012, Ms. Buffalino resigned as guardian, alleging that Mr. D. had become verbally abusive. With Mr. D.’s consent, Mr. Isler was then appointed as successor guardian.
With regard to the within applications, the court conducted a hearing on December 10th, 19th, and 20th of 2012 and January 4th and 15th of 2013. Testimony was given by Mr. D., his nurse, *636 his aide, the former guardian Lorraine Buffalino, the manager of the physical therapy office where Mr. D. received treatment, the manager of the agency supplying home health care aides, and the court evaluator. In addition, MHLS, waiving Mr. D.’s doctor-patient privilege (see CPLR 4504, 4507), called his treating psychiatrist and psychologist to testify as to his mental capacity.
Before a court may appoint a guardian on consent of an alleged incapacitated person, it must first determine that the appointment is necessary. Only after the court has found that a guardianship is necessary may the court permit an individual to agree to the appointment of a guardian or make a finding of incapacity (see Mental Hygiene Law § 81.02 [a]; Matter of Daniel TT [Dianne UU.]., 39 AD3d 94 [3d Dept 2007]; Matter of Crump [Parthe], 230 AD2d 850 [2d Dept 1996]; Matter of O’Hear [Rodriquez], 219 AD2d 720 [2d Dept 1995]; Matter of Maher, 207 AD2d 133 [2d Dept 1994]). In order for the court to allow an individual who is alleged to be incapacitated to agree to the appointment of a guardian, the court must be satisfied that such person has ti'he capacity to agree (see Matter of Loccisano, NYLJ, Aug. 18, 1^96, at 23, col 1 [Sup Ct, Suffolk County 1996]). Unfortunately, article 81 of the Mental Hygiene Law fails to provide gu: dance as to what standard is to be utilized to determine whether an individual has the capacity to consent to the appointment of a guardian.[1]
In the absence of statutory direction, a court, in determining a person’s cjapacity to agree to a guardianship, will generally consider: thje individual’s ability to meaningfully interact and converse wiih the court, his or her understanding of the nature of the proceeding, and his or her comprehension of the personal and property management powers being relinquished. The inquiry by the court to determine whether an individual has capacity to consent is not the equivalent of the in-depth examination which occurs in a full hearing to determine incapacity wherein the person’s ability to understand and appreciate the nature and consequences of their functional limitations is explored and determined.
The concept of a consent guardianship both begins and ends in Mental Hygiene Law § 81.15 (a) wherein a distinction is made *637 between a person agreeing to the appointment of a guardian and a person determined by the court to be incapacitated.[2] Case law on this subject is sparse. Indeed, this was first noted 17 years ago in Matter of Loccisano and again in 2009 in Matter of JS (24 Misc 3d 1209[A], 2009 NY Slip Op 51328[U] [Sup Ct, Nassau County 2009]).
Allowing an alleged incapacitated person to consent to a guardianship permits him or her to sidestep the issue of incapacity, maintain a greater degree of dignity, and assists the petitioner in maintaining a relationship with the individual alleged to be in need of a guardian, which is often strained by the commencement of such a proceeding. Courts frequently, therefore, will permit individuals to consent to the appointment of a guardian. The problem inherent in the use of consent guardianships is that if the individual, subsequent to the appointment of the guardian, either refuses or becomes incapable of consenting to a necessary expansion of powers, the streamlined procedure provided by Mental Hygiene Law § 81.36 is unavailable.[3] In such a situation it is necessary to file a new application to appoint a guardian wherein the person’s incapacity can be established.
A consent guardianship is created on the basis of the individual’s agreement thereto and it does not morph into a non-consent guardianship with its inherent finding of incapacity because an emergency occurs and an expansion of powers becomes necessary. Granting an application to expand powers pursuant to Mental Hygiene Law § 81.36 without the individual’s consent would effectively be a declaration of incapacity without a hearing to determine said incapacity. Such a procedure is not authorized by Mental Hygiene Law § 81.36 and would violate the essence of the protections provided to alleged incapacitated individuals by the drafters of article 81 of the Mental Hygiene Law. It would also trample on the individual’s due process rights (see Matter of Levy v Davis, 302 AD2d 309 [1st Dept 2003]).
*638 Here, Mr. D. refused to consent to the successor guardian’s request to expand personal and property management powers and has moved to terminate the consent guardianship. At the original guardianship hearing in 2009, Mr. D. was severely depressed and indicated that he had absolutely no reason to live. He had been an executive with the Nikon Corporation, traveling around the world on business, when he began to have seizures. He was ultimately diagnosed with brain cancer. The cancer required multiple surgeries and the removal of a portion of his skull. At the time of the hearing, Mr. D. was suffering from severe depression, diabetes, seizure disorder, Parkinson’s disease and Caisson’s disease. In addition, he was estranged from his brother who held his power of attorney and his wife who had filed for divorce. There were simply no available resources or a plan in place to assist him in managing his affairs. Moreover, there were allegations that Mr. D. was verbally abusive to his aides. At the time of the original hearing, Mr. D. required 24-hour home care; was prescribed over 15 medications; needed assistance with all his activities of daily life; and could not pay or assist in paying his bills. He suffered from severe short term memory loss and had significantly impaired impulse control.
At present, Mr. D. states that he no longer needs 24-hour care and can attend to all of his activities of daily life unassisted. In addition, he has established a plan for his present and future care needs. His counsel argues that with a plan in place, there is an available resource that obviates the need for a guardian. Mr. D. testified that he has approximately $1,500,000 in an investment account. His income consists of: (1) $108,000 a year from a disability policy (which will expire in Oct. 2013); (2) $24,000 a year from Social Security; and (3) $16,500 a year in rental income. Mr. D. plans to withdraw $148,000 (approximately 10%) each year from his investment account for the next 10 years. This would provide him with an income of $188,500 a year after October of this year, and would allow him to remain in his home for the next 10 years, meeting his present expenses of $185,200 a year.[4] Mr. D. testified that when his money runs out he will enter a skilled nursing home, spend down any remaining assets and apply for Medicaid. Until such time, he *639 states that he intends to use his aides to assist in paying his bills, taking him to doctor’s appointments and shopping.
The determination as to whether Mr. D. is in need of a guardian to care for his personal and property management needs as Mr. Isler and the court evaluator argue, or, is not in need of a guardian as his treating psychiatrist and psychologist testified, cannot be made at this time. Because this is a consent guardianship and there has been no finding of incapacity, for all of the reasons stated above the court must treat Mr. Isler’s application as a new guardianship petition. As such, the petitioner has the burden of proving by clear and convincing evidence that there is a need for a guardian before the court can even address the question of incapacity (see Mental Hygiene Law § 81.02 [a]). After considering the evidence adduced at the hearing, it is determined that the successor guardian failed to meet his burden of proving that a guardianship is necessary. In view thereof, the court is powerless to address the question of Mr. D.’s alleged incapacity. The intention of the drafters of article 81 was that a guardianship be used as a last resort (see e.g. Matter of Nellie G., 38 AD3d 547 [2d Dept 2007], Matter of Daniel TT., 39 AD3d 94 [2007]; Matter of Albert S., 286 AD2d 684 [2d Dept 2001]). The statute not only requires that the court explore all other available resources and alternatives before a guardian is appointed, it requires that the petition itself must allege the unavailability of such other alternatives or resources (see Mental Hygiene Law § 81.08 [a] [14]).
It is not the court’s role to determine whether Mr. Isler’s plan is more appropriate than Mr. D.’s plan. The dispositive question is whether there is an available resource in place which can function as an alternative to a guardianship. Here there is an available resource in place. If pursuant to Mr. D.’s plan his bills are not being paid, he is not going to medical appointments, or he cannot maintain health care aides, such failures could constitute evidence that Mr. D. lacks available resources to assist him and that a guardianship is necessary. Thereafter, upon the filing of a petition for a guardian, a determination could be made concerning his incapacity.
For the reasons set forth above, as stated in this court’s order of February 14, 2013, MHLS’s motion (011) for an order discharging the guardian is granted; the successor guardian’s application (012) for a declaration as to Mr. D’s capacity is denied; and MHLS’s cross motion (013) for discharge of Mr. Isler as successor guardian is denied as moot.

. In contrast, the legislature has provided guidance with respect to the standard to apply when determining if a person had capacity to execute a power of attorney (see General Obligations Law §§ 5-1501 [2] [c]; 5-1501B [1] [b]) and a health care proxy (see Public Health Law § 2981).

. There are other references in article 81 of the Mental Hygiene Law to the individual agreeing to the appointment of a guardian (see Mental Hygiene Law §§ 81.02 [a] [2]; 81.09 [c] [5] [i]; 81.16 [c] [1]; see also § 81.21 [b] [5]; [d] [1]), but again, there is no statutory standard as to what level of capacity is required to support a valid, binding or meaningful agreement.

. Mental Hygiene Law § 81.36 only discusses modification of powers for incapacitated individuals, and appears on its face to only authorize applications for individuals found by the court to be incapacitated.

. Mr. D.’s present expenses are: $2,640 for oil; $2,700 for LIPA; $91,000 for home health care aides; $1,740 for Optimum; $2,500 for food; $66,000 for mortgage; $16,000 for real estate taxes; $940 for landscaping; and $1,680 for medications.