OPINION OF THE COURT
H. Patrick Leis III, J.
This divorce action was transferred to the Model Integrated Guardianship Part by the undersigned in an order dated April 1, 2011.[1] The matrimonial case was commenced on January 27, 2009 by the plaintiff, Christopher C., against his wife, Bonnie C. During the course of that proceeding, after it became apparent that Mrs. C. was having difficulty processing issues and assisting her attorney, the judge suggested that a Mental Hygiene Law article 81 guardianship proceeding be initiated.[2] Thereafter, in February 2011, the defendant’s brother Ronnie Atanasio filed an article 81 petition seeking to be appointed as the guardian for his sister. On March 30, 2011, this court conducted a guardianship hearing at which the defendant readily acknowledged her need for a guardian. The defendant stated that she had a history of depression, generalized anxiety and detoxification from pain medications. In addition, she explained that her anxiety and inability to function during periods of stress made it difficult for her to assist her matrimonial attorney and to weigh the relative merits of either negotiating a settlement or going to trial. After the hearing, the court, with Mrs. C.’s consent,[3] appointed the defendant’s brother as her guardian. The guardian was given, inter alia, the power to participate in the divorce proceeding and to decide whether to negotiate a settlement or proceed to trial.
*862 The parties have stipulated to a divorce based on constructive abandonment. The equitable distribution and maintenance portion of the case was tried before the undersigned on February 4, 5, 6, and 7, 2013. Mrs. C. was assisted during the trial by Bronwyn Black, her present guardian.[4] The remaining portion of the defendant’s motion (001) for counsel fees and the plaintiffs motion (002) requesting a suspension and repayment of temporary maintenance awarded prior to trial, and a redistribution of the interim counsel fees previously awarded, were referred to the trial of the action and will be decided herein. The defendant’s and plaintiffs trial memoranda of law were received on March 7, 2013.
The evidence at trial establishes the following. The parties were married on October 19, 1990. The plaintiff is currently 51 years old and the defendant is currently 56 years old. In 1990, the plaintiff suffered a back injury from a fall. In 1996 he was found by the Department of Social Services to be permanently partially disabled (see plaintiffs exhibit 57). He remained out of work from the time of his injury until 2000 when he became employed at L’egent International (defendant’s brother’s company) selling women’s accessories. Since the time of his back injury, the plaintiff alleges he has lived in constant pain.
Mr. C. states that he does not recall what he earned during the first years of the marriage. He did, however, receive workers’ compensation and Social Security disability for a period of time after his initial injury. The plaintiff states that he received a settlement from the accident of $133,000 which he alleges he used to fund the parties’ joint brokerage account. The plaintiff stopped working for L’egent in 2008 and has not worked since.
The defendant also worked at L’egent International from 2000-2003. She eventually was promoted and ran all overseas operations including purchasing, shipments and tracking. According to joint tax returns submitted in evidence (see plaintiffs exhibits 1, 2, 3, 4), the parties’ income was:
[[Image here]]
*863 According to individual tax returns submitted into evidence (see plaintiffs exhibits 5, 6, 7, 8, 9, 10, 11, 12, 13, 14), the parties’ income was:
[[Image here]]
The parties lived a lavish lifestyle from 2000 to 2003. Together they have owned financial investments worth over one million dollars, a 50% interest in a beach house on Dune Road in Westhampton Beach worth approximately $3,000,000, a 50% interest in a 48-foot Sea Ray boat purchased in 1999 for $635,000, and Rolex watches worth over $22,000. The plaintiff testified that his income dropped in August of 2008 when he stopped working for L’egent and became unemployed. Since that time, he has paid his living expenses by drawing on two home equity loans established in 2006 and 2007, one for $145,714 and the other for $129,377, respectively. He pays $1,400 per month for both loans. He also alleges that he has been withdrawing money from his brokerage account to pay his living expenses and the court-ordered pendente lite payments to the defendant.
The defendant apparently suffers from a variety of mental and emotional issues which her attorney and guardian argue have prevented her from presenting a cogent explanation for her past conduct. Although the defendant now vehemently denies any mental health issues, her conduct both on and off the witness stand would establish the contrary. Determining the full extent and nature of the defendant’s mental and/or emotional problems is extremely difficult given the fact that she consented to the guardianship, thereby obviating the need for a determination on the issue of her incapacity.[5] Also, there was no medical or expert testimony offered concerning the state of the defendant’s mental health. Thus, the court is left to rely on its *864 own observations of the defendant’s bizarre behavior during the trial, the defendant’s squandering of over one million dollars in assets from 2003 to the present, her demonstrated lack of impulse control, and her consent to have a guardian appointed for her property to discern the level of impairment caused by her mental and emotional difficulties.
The court finds that the credible evidence establishes that the defendant has not worked since 2003 and is currently unable to do so due to her severe emotional and mental deficiencies. There is no evidence that the defendant has received any income or has filed any individual tax returns after 2006.[6] At present, her only reliable source of income is Social Security disability which she claims is $742 per month. She testified that although she has received sporadic rental income in various amounts from a house she purchased in Lindenhurst, the home is currently in foreclosure. Her right to further rent is therefore unlikely. Mrs. C. also receives food stamps. While she appears to have a 50% ownership in a house in Quogue, no proof of its value or any rental income has been presented to the court. The defendant alleges it is valueless and there has been no evidence submitted to the contrary. According to the defendant, she is not allowed by her brother (who owns the other 50% interest) to reside in the Quogue house and she claims to be homeless.
While the plaintiff has been able to retain two attorneys (each from separate law firms) during the course of this action, the defendant’s attorney has only been paid $10,000 for several years worth of representation. Although the defendant’s counsel holds a $22,000 judgment against the plaintiff for interim attorney’s fees, the plaintiff has refused to pay any amount to the defendant’s attorney.
Equitable Distribution
The credible evidence establishes that the plaintiff and defendant stopped living together in January 2003. At that time, when there was no question as to the defendant’s capacity, the parties went to an attorney for assistance in dividing their assets. According to Mr. C., the attorney advised them that there was no *865 need to reduce the agreement to writing. Thus, no written agreement was made. Their broker, a financial planner for Oppenheimer, testified that he was directed in a written letter signed by both parties in 2003 (see plaintiffs exhibit 17), to divide all of the parties’ brokerage accounts equally. The witness indicated that each party received approximately $575,000 (see plaintiffs exhibits 16, 18).
The parties’ financial planner further testified that after the division of assets, pursuant to Mrs. C.’s direction, he began to transfer funds out of her personal brokerage account. Some monies were transferred to Mr. Koplan, the gentleman with whom the defendant resided at that time, while other sums were transferred into the defendant’s personal bank account. The broker testified that Mrs. C. also had the broker transfer money directly to various family members and friends. In addition, the defendant purchased a time-share, a deli and a mobile home.[7] The broker testified that although he warned the defendant, she continued to deplete her assets. The defendant also purchased a home in Lindenhurst and a 50% interest in a home in Quogue. The credible evidence establishes that the Lindenhurst home is currently in foreclosure. No evidence regarding the Quogue home’s value has been submitted. Both homes were purchased with Mrs. C.’s remaining assets after the parties’ 2003 separation.
As part of the division of the parties’ assets, Mrs. C. received all of her jewelry which the plaintiff claims was worth in excess of $100,000. Mr. C. received the marital house located in Bay Shore, NY, which had been appraised in December of 2002 for $365,000, and had a mortgage of $297,000. Both the plaintiff and the defendant signed the deed transferring the marital residence to the plaintiff at their attorney’s office in 2003 (see plaintiff’s exhibit 19). Mr. C. testified that in return for the house, he gave Mrs. C. $20,000 in cash as well as the right to collect approximately $40,000 to $50,000 in loans made to her family and friends from marital asset^f Furthermore, in 2006, the defendant received $450,000 from the sale of her 25% interest in the Westhampton Beach house and the plaintiff received $385,000 for his 25% interest. The plaintiff used the proceeds to buy a condominium in Boca Raton, Florida. It is unclear what *866 the defendant did with her money. What is clear, however, is that currently the defendant has no assets of value and she has squandered over $1,000,000 between 2003 and the present. In 2011, the defendant filed for bankruptcy protection and was subsequently discharged.
This court will not disturb the parties’ pre-litigation division of their assets as such was done voluntarily and fairly. Accordingly, the court will ratify the parties’ own fully executed and equitable division of their property made at the time of their separation (see Reeves v Reeves, 137 AD2d 586 [2d Dept 1988]; Perkins v Perkins, 226 AD2d 610 [2d Dept 1996]). The fact that the plaintiff still retains a large portion of the assets he received while the defendant has dissipated her share of the assets does not now afford the defendant a right to a portion of the plaintiffs remaining assets. There is no dispute that the defendant has not contributed directly or indirectly to the separate assets retained by the plaintiff. Indeed, the marital partnership essentially terminated when the parties separated in 2003. Therefore, the court finds that the defendant has no legal or equitable interest in what is now the plaintiffs separate property acquired as a result of the 2003 asset division. Accordingly, the defendant will receive no portion of the plaintiffs assets.[8]
Maintenance
As set forth above, in 2011 the defendant filed for bankruptcy protection and received a discharge in bankruptcy. She did not indicate in her bankruptcy petition, however, that she was potentially entitled to a maintenance or equitable distribution award. The plaintiff argues that the defendant’s failure to list maintenance in the petition as a potential asset, bars her from now requesting post divorce maintenance. The court disagrees. The defendant’s failure to include in her petition an allegation that she was entitled to maintenance could not serve as a preclusion to an award of post divorce permanent maintenance because her right to post divorce permanent maintenance does not arise until it is established at trial and awarded by the court. A future potential post divorce maintenance award simply does not exist as a property right and the plaintiff has cited no *867 case to the contrary. Post divorce maintenance arises only after the current and future need for same is established, the paying spouse’s ability to pay such maintenance is determined, and a court has made a final award. Any listing of “potential” post divorce maintenance in the defendant’s bankruptcy petition would have been completely speculative and without basis. Indeed, at trial many factors must be considered before an award of post divorce maintenance can be made (see Domestic Relations Law § 236 [B] [6] [a]). In addition, even if a right to potential post divorce maintenance had been disclosed in the bankruptcy petition, it is likely that the trustee would have deemed it as exempt property necessary for the defendant’s support (see 11 USC § 522 [d] [10] [D]).[9]
Post divorce maintenance is awarded to ensure that the receiving spouse’s reasonable needs are met (Cooper v Cooper, 84 AD3d 854, 857 [2d Dept 2011]). Furthermore, before a court may award post divorce maintenance it must consider, inter alia, any distributive award made in the proceeding (Domestic Relations Law § 236 [B] [6] [a] [1]). The consideration of a distributive award in determining the spouse’s post divorce maintenance clearly cannot be determined prior to a divorce as equitable distribution can only be determined upon the granting of the divorce (Mattioli v Mattioli, 48 AD3d 1143, 1145 [4th Dept 2008]; see Sinha v Sinha, 285 AD2d 801, 803 [3d Dept 2001]). Therefore, no post divorce maintenance, potential or otherwise, could exist at the time of the filing of the defendant’s bankruptcy petition and the defendant therefore is not estopped from seeking post divorce maintenance in this proceeding.
According to her updated 2012 net worth statement (see defendant’s exhibit A), the defendant indicates that she has no assets of value. She only lists a heavily encumbered home in Lindenhurst, which is presently in foreclosure, and her 50% interest in the Quogue house which she alleges is valueless (see defendant’s exhibit A). The defendant’s current monthly income is $742 in Social Security and occasional rental income that varies in amount from the Lindenhurst house. She also receives food stamps.
*868 Regarding the defendant’s expenses, according to her 2012 net worth statement (see defendant’s exhibit A), Mrs. C. lists the Bay Shore residence that is solely owned by the plaintiff as her own housing expense, even though she has not owned it nor lived there since 2003. The court finds incredible her claim that she pays $2,150 rent and $594 for utilities for said Bay Shore residence. The court does find reasonable the defendant’s listed monthly food expense of $700, monthly clothing expense of $200, and monthly beauty parlor and miscellaneous other expenses of $250. The court does not find reasonable a monthly laundromat expense of $240, a monthly recreation expense of $170, monthly psychiatrist or psychologist expenses of $652.50 without any proof of bills or payment, a monthly pharmaceutical expense of $219 without any evidence of such expense, monthly snow removal expense of $50 without any proof, and monthly lawn expense of $100 without any support in the record. Nor does the court find reasonable an unsupported automobile expense of $225 per month for a driver. The testimony indicates that the defendant presently drives a Mercedes Benz automobile owned by her brother. The listed expense for gas ($212) for the car is reasonable. The listed monthly expense of $110 for car insurance when she does not presently pay for insurance, as well as her listed monthly expense of $300 for house cleaning services when she alleges she is homeless, are also not reasonable. The defendant also lists an expense of $1,500 per month for a caretaker. The only evidence at trial relating to a caretaker, which comes from Mrs. C.’s own testimony, demonstrates that arrangements were made for a caretaker to live with the defendant in the Lindenhurst house. Mrs. C., however, testified that she never lived there with said caretaker and that the “caretaker” is now a tenant in the Lindenhurst house.[10] Therefore, the $1,500 caretaker expense is without support and unreasonable. Similarly, the listed monthly expenses of books ($100) and vacations ($400) are unreasonable as there is no support for same in the record. Moreover, the $300 monthly expense for cigarettes is unreasonable as there is no testimony that the defendant even smokes. While the defendant owns a 50% share of the house in Quogue and still owns the house in Lindenhurst (until the foreclosure suit is completed), the de *869 fendant claims she is homeless. According to her uncontradicted testimony, she cannot live in either house.
In her 2009 bankruptcy petition filed December 11, 2009, which was subsequently withdrawn and dismissed, the defendant indicated her monthly income was zero and her expenses were $1,735 (see plaintiffs exhibit 54). Five days later, the defendant completed a net worth statement in this case (see plaintiffs exhibit 53) indicating that her monthly expenses were $8,796. In her 2011 bankruptcy petition filed on March 8, 2011, the defendant indicated an average monthly income of $1,500 and average monthly expenses of $1,500 (see plaintiffs exhibit 55). On July 10, 2012, in an updated net worth statement (see defendant’s exhibit A), the defendant indicated that her total monthly income was $1,629 and her expenses were $8,393.50. In the schedule 1 of the 2011 bankruptcy petition, defendant indicated that she has been disabled since 2003 and that her only source of income was money from her brother in the amount of $1,500 a month. Yet in January 2008, the defendant executed a loan application to refinance her Lindenhurst home (see plaintiffs exhibit 30) in which she stated that she has worked for L’egent International Limited for 16 years (1992 to 2008), making $18,500 per month. According to the lender, Charles Atanasio, one of the defendant’s brothers, verified the defendant’s employment to the lending institution (see plaintiffs exhibit 31). The defendant only offered tax returns through 2006. Absent is a return for 2007 and 2008 and any other returns for the years thereafter.
As a result of the defendant’s aforementioned inconsistent statements concerning income and expenses made in sworn court documents, she has no credibility with the court. Regardless of these misstatements and inconsistencies, however, the court must do what is fair and just to prevent the defendant from becoming a ward of the State. Being unable to rely on the truth of her statements or testimony, the court must determine the defendant’s current needs and necessary monthly expenses (see Pottala v Pottala, 112 AD2d 553 [3d Dept 1985]). Although the parties maintained a high standard of living from 2000 until their separation in 2003, the defendant was not accustomed to that standard of living from 1990 to 2000, nor from 2003 to the present. Accordingly, the court will not attempt to maintain a standard of living that only occurred during 3 years of the defendant’s 19 years of marriage. The defendant’s current standard of living is extremely modest.
*870 Although the defendant has claimed that her monthly expenses were $1,500 in her 2011 bankruptcy petition and $8,395.50 in her updated net worth filed in 2012, the court finds that the defendant’s reasonable monthly expenses are approximately $1,350 plus a reasonable housing expense of $1,900 per month for a total of $3,250. After subtracting the defendant’s Social Security disability income of $742, Mrs. C. has a short fall of approximately $2,500 per month.[11] The court finds that the defendant is not capable of becoming self-supporting and that a $2,500 per month non-durational, permanent post divorce maintenance is necessary to provide for the defendant’s reasonable needs and expenses and to prevent the defendant from becoming a ward of the State.
The plaintiff, according to his net worth statement (see plaintiff’s exhibit 20), has $5,000 in his checking account, $15,000 in SW Securities brokerage account, $613,000 in an Oppenheimer 401(k) retirement account and $20,000 in an Oppenheimer IRA account. He also owns a Harley Davidson motorcycle. In addition, Mr. C. has been able to pay two attorneys from separate law firms during the course of this proceeding.
The plaintiff has not worked since 2008 and has made no effort to do so during the pendency of this divorce action which began in January of 2009. He continues, however, to enjoy a lavish lifestyle. Although he alleges that he has been unable to work since 2008 and has been forced to refinance his home and invade the principal on his investments to pay his expenses, the court can find no reason why this 51-year-old man who earned over six million dollars since becoming disabled (and after being declared in 1996 to be permanently partially disabled) is incapable of working. According to his net worth statement (see plaintiff’s exhibit 20), the plaintiff owns and enjoys living in two homes: a condominium in Boca Raton, Florida, which has no mortgage, and the former marital residence located in Bay Shore. According to the plaintiffs testimony he pays $6,400 per year in common charges for his condominium in Florida, $9,000 per year in dues and $4,000 per year in property taxes, for a total of $19,400 per year.[12] The plaintiff also pays $420 a month for medical insurance. He drives a 2010 M35 Infiniti luxury *871 automobile costing $575 per month. Mr. C. lists a total expense of $2,466 per month[13] for his apparent 50% interest in the 48-foot Sea Ray boat that he jointly purchased for a total of $635,000 in 1999 with Mrs. C., the defendant’s brother, Charles Atanasio, and his sister-in-law, Mary Atanasio.[14] Yet, in spite of these bills and his lack of income, the plaintiff has chosen to continue paying his expenses, some of which are extravagant, by refinancing his New York home and by invading the principal of his investments.
The plaintiff has failed to present persuasive or competent proof of any present impairment that precludes employment. Although the plaintiff does not appear to have sufficient income, without working, to maintain the high standard of living he currently enjoys and at the same time pay lifetime maintenance, he is responsible to support his wife who, the evidence establishes, cannot support herself (see generally Sass v Sass, 276 AD2d 42, 47 [2d Dept 2000]). This might necessitate that he become employed again. It is clear that the goal of economic independence is not a realistic one for this defendant given her mental and emotional difficulties. The court must ensure that Mrs. C.’s reasonable needs are met (Domestic Relations Law § 236 [B] [6]; Hartog v Hartog, 85 NY2d 36, 52 [1995]; Ciampa v Ciampa, 47 AD3d 745, 747 [2d Dept 2008]; Sass v Sass, 276 AD2d at 49). The court notes that it is not requiring the plaintiff to divide his brokerage accounts with the defendant as she has requested, nor is the court granting the defendant an equitable interest in the former marital residence. The court is, however, determining that under the circumstances presented here, in particular the defendant’s inability to be self-supporting, it is necessary for the defendant to receive permanent maintenance.
In making the decision to grant permanent maintenance to the defendant the court has considered all factors pursuant to *872 Domestic Relations Law § 236 (B) (6) (a) and makes specific findings as follows:
1. The court finds that the defendant has no income and it appears, from the evidence submitted at trial (or lack thereof), that she has no assets of any value as the interests she holds in two houses are apparently worthless. Furthermore, it appears that the plaintiff has, inter alia, over half of a million dollars in investments, two properties (one free and clear) and a 50% interest in a 48-foot Sea Ray boat. While the plaintiff has no employment income, there is no reason why he cannot work.
2. The parties were married on October 19, 1990. They separated in January 2003. This action was commenced on January 27, 2009. This is, thus, a 19-year marriage.
3. The plaintiff is 51 and the defendant is 56 years old. The plaintiffs health is good. The defendant, however, has a guardian and alleges that she suffers from a depressive disorder and anxiety.
4. Although the plaintiff has had back issues since his accident in 1990 and has been found by the Department of Social Services to be permanently partially disabled, he has worked thereafter and has earned substantial sums of money from 2000 to 2008. There has been no credible evidence produced that he is incapable of working now or in the future. The defendant, however, has a proven track record since the parties separation that establishes that she is incapable of working and providing for her own needs.
5. There is no need for either party to incur educational or training expenses.
6. There was no premarital joint household. There were, however, pre-divorce separate households. The plaintiff has maintained a high standard of living while the defendant is essentially homeless.
7. There is no evidence of acts by either party that have inhibited the other party’s capacity to obtain meaningful employment.
8. The defendant’s actions and conduct since the separation demonstrate that she lacks the ability to ever become self-supporting.
9. There is no evidence that the defendant has forgone or delayed educational training, employment or career opportunities during the marriage.
10. There are no children of the marriage.
*873 11. There is no credible evidence establishing that either party’s earning capacity is inhibited by the need to care for another person.
12. Neither the parties’ ages nor their absence from the work force appear to be a factor affecting either party’s ability to obtain meaningful employment.
13. There are no additional exceptional expenses.
14. The payment of maintenance would provide a tax advantage to the plaintiff and have no consequence to the defendant based on her minimal income.
15. There is no equitable distribution as the parties had voluntarily divided all marital assets many years prior to the commencement of this action.
16. The defendant did work for a few years during the marriage and, thus, contributed as a spouse and wage earner.
17. There is no evidence of wasteful dissipation of marital assets (except the dissipation by the defendant of her separate assets).
18. There is no evidence of the transfer or encumbrance of any assets in contemplation of this action without fair consideration.
19. Neither party has submitted evidence of the loss of health insurance benefits upon dissolution of the marriage.
The court awards the defendant non-durational permanent maintenance of $2,500 per month, which, coupled with her disability and food stamps is the bare minimum necessary to afford the defendant the ability to pay rent and utilities, and other necessities. Such award shall continue until the earliest of her eligibility for full Social Security benefits, her remarriage, or the death of either party (see Giokas v Giokas, 73 AD3d 688 [2d Dept 2010]).
Motion 001
The defendant requested, and was awarded, interim counsel fees in the amount of $22,664.95. There has been no evidence presented at trial or argument advanced posttrial to cause the court to disturb this award.
Motion 002
The plaintiff moved for reconsideration of the court’s temporary maintenance award and for a refund of all amounts paid to the defendant for temporary maintenance. After *874 considering all of the evidence at trial, the court declines to suspend or refund the previous award of temporary maintenance and the plaintiffs motion (002) is denied accordingly.
Counsel Fees
Pursuant to the stipulation placed on the record, all parties have waived a hearing on counsel fees and have agreed to a finding by the court based upon submitted papers. The defendant has requested an additional amount of $37,506.64 for counsel fees which the court finds reasonable based on the results obtained, the hours spent (as established by the defendant’s attorney’s submission of the defendant’s posttrial memorandum), the competency of counsel, and the hourly rates charged. In exercising its discretion to award counsel fees, the court is mindful of the parties’ disparate financial circumstances as demonstrated throughout the trial and the circumstances of this case (Franco v Franco, 97 AD3d 785, 786-787 [2d Dept 2012]). Moreover, the plaintiff has failed to set forth any legal reason in his posttrial submission to deny counsel fees. Accordingly, the court awards the defendant the sum of $37,506.64 as attorney’s fees to be paid to the defendant’s attorney by the plaintiff within 60 days of the date below (see Domestic Relations Law § 237).
Based upon the foregoing, it is hereby ordered that the plaintiff is directed to pay non-durational permanent maintenance to the defendant in the amount of $2,500 per month until the defendant is eligible to receive full Social Security benefits, the defendant’s remarriage or the death of either party, beginning July 10, 2013, and by the 10th of each month thereafter; it is further ordered that the plaintiff is directed to pay the defendant’s attorney’s fees in the amount of $37,506.64 in addition to the amount of $22,664.95 as previously awarded to the defendant for attorney’s fees, to the defendant’s attorney; it is further ordered that the plaintiffs motion (002) is denied in its entirety.

. The Model Integrated Guardianship Part was established in 2005 by then Chief Judge Judith Kaye to extend the “one-family one-judge” approach successfully employed in Integrated Domestic Violence Parts to guardianship cases. The Model Part hears all court cases involving the alleged incapacitated person (i.e.: foreclosure actions, summary eviction proceedings, civil forfeiture proceedings, felony and misdemeanor criminal proceedings [including elder abuse], matrimonial actions, and any matter involving an order of protection) once a guardian has been appointed.

. While a guardian ad litem can be appointed in a matrimonial case to assist a party suffering from a mental or emotional difficulty, a guardian ad litem can only serve as an advisor to the party. A guardian (appointed pursuant to Mental Hygiene Law art 81), however, can be given any power that the individual himself or herself possesses. This could include the power to decide whether to negotiate a settlement or proceed to trial in the matrimonial action.

. As Mrs. C. consented to the appointment of a guardian, there was no finding of incapacity (Mental Hygiene Law § 81.02 [a] [2]).

. After the defendant’s brother was removed by the court, Ms. Black was appointed as the defendant’s successor guardian.

. See Mental Hygiene Law § 81.02 (a) (2); Matter of Buffalino (James D.), 39 Misc 3d 634 (Sup Ct, Suffolk County 2013).

. While the plaintiff has shown that the defendant received a wire transfer of $125,000 into her bank account from her brother Charles Atanasio in 2008, he has not proven that it represents a payment of salary. The defendant denies that it reflects a salary. In any event, there is nothing left of that money and there is no evidence of other large deposits to defendant’s bank account.

. There has been no evidence submitted regarding the value of the timeshare, the deli or the mobile home, and they are not listed as current assets of the defendant in her most recent net worth statement (see defendant’s exhibit A).

. The court is not making a determination as to the ownership or distribution of the 48-foot Sea Ray boat, even though the defendant claims no present interest in it, because there has been no evidence introduced regarding its current value, its legal title, or any agreement by the four separate owners as to a legal division or acquisition of the defendant’s share.

. The intention behind including potential maintenance on a bankruptcy petition would be to afford the bankruptcy trustee an opportunity to obtain maintenance for the benefit of creditors. Such a request by a trustee, however, would be in direct conflict with the purpose behind awarding maintenance, which is to provide for the spouse’s reasonable needs. Therefore, any request by a trustee to award maintenance to Mrs. C. for the benefit of her creditors would be violative of the clear intent of the maintenance provisions.

. According to the defendant’s testimony, as a tenant, the caretaker pays the defendant rent but has an arrangement with the defendant that allows her to deduct any payments made to maintain the house from the rent, resulting in a greatly reduced monthly payment or no monthly payment.

. The court is not considering the past sporadic rental income from the Lindenhurst house which is in foreclosure.

. According to the plaintiffs net worth statement (see plaintiffs exhibit 20), however, his Home Owner’s Association fees on his Florida home are $5,892 per year, his real estate taxes for his Florida home are $5,196, his club *871 fees (presumably for his Florida home) are $9,600 and his homeowner’s insurance for his Florida home is $2,400 per year.

. The boat currently has a $400,000 mortgage and the plaintiff pays $1,800 per month for his share of the mortgage. He also pays $208 per month-for his share of the slip rental, $208 per month for his share of the insurance, and $250 per month for boat maintenance.

. The defendant, who originally held a 25% interest, has not contributed to the boat expenses nor used the boat since the parties’ separation in 2003. In fact, at trial, the defendant asserts no interest in the boat. Neither party has presented any proof of the title to the boat nor has either party introduced any evidence regarding the legal disposition of the defendant’s 25% share. It appears that Mrs. C. has relinquished her 25% share possibly to the plaintiff, who may now have up to a 50% interest in the boat.