OPINION OF THE COURT
Sharon A.M. Aarons, J.
A petition has been filed for the appointment of a guardian of the person and property of Joseph G., an alleged incapacitated person (AIP). This court is satisfied that the AIP was served with the order to show cause and petition by personal delivery at least 14 days prior to the return date, and that all other necessary interested persons required to be served under Mental Hygiene Law § 81.07 were timely served with the order to show cause and petition.
Mental Hygiene Legal Service, by Kimberly Tate-Brown, Esq., was appointed to serve as counsel for the AIP The hearing was held on October 31, 2014. At the hearing the petitioner was represented by Miller & Milone P.C., by Gillian Ballentine-Allman, Esq.
The court heard the testimony of Sean Golden, a social worker at St. Barnabas Hospital; Jacqueline Perrier, a social worker at Westchester Center for Rehabilitation & Nursing; and the AH] Joseph G.
At the commencement of the hearing, the petitioner’s attorney requested that, based on the AIP’s consent, the petition be considered one for a person in need of a guardian, and not based on incapacity. The petitioner’s attorney further requested that the powers of the appointed guardian be limited to those to which the AH] through his counsel, and the petitioner’s attorney agreed. The powers were to: (1) marshal the AIP’s assets; (2) acquire health insurance for the AIP; and (3) locate housing for the AIP Additionally, the petitioner’s attorney asked the court to appoint the community guardian, United Guardianship Services in Brooklyn, as guardian for the AH] and that the *814 guardianship be limited to six months. The court directed that the hearing proceed.[1]
Findings of Fact
It is determined that the following findings of fact have been established by clear and convincing proof upon the documentary evidence submitted and the hearing testimony:
Sean Golden testified that he is a discharge social worker at St. Barnabas Hospital. The AIP was discharged from St. Barnabas and admitted to Westchester Rehabilitation & Nursing Center in September 2014. The AIR who is 72 years old, was admitted to St. Barnabas under “social admission” in June 2014, meaning that while there was nothing medically wrong with the AIR it was determined that he should be held until there was a safe place for him to go to. The AIP did not have any identification when he arrived at St. Barnabas. The AIP told the police, and later Mr. Golden, that he wandered from his sisters’ home, and was unable to find his way back there. He believed that his sisters, Rose and Mary G., lived together in a home near “Fordham and University.” Mr. Golden accompanied the AIP to the area on three separate occasions, but he was unable to identify his sisters’ house during any of those visits. St. Barnabas personnel also contacted law enforcement officials in multiple areas, who stated that no missing persons reports had been made about the AIP Other than these sisters, the AIP has no known relatives.
The only person they were able to contact was a nun who worked at the same school the AIP did, when the AIP was employed as a teacher. That school is no longer in existence. Other than to confirm that she knew the AIP in that capacity, the nun did not provide any further information on the AIP Mr. Golden also spoke with employees at the Rite Aid where the AIP was found, but they were also unable to provide any information about the AIR St. Barnabas requested that Rite Aid use the AIP’s sisters’ names to see if they had filled any prescriptions there, but Rite Aid refused to provide that information.
The AIP has been diagnosed with early-stage dementia. The AIP is able to carry out his activities of daily living, including *815 bathing, dressing, feeding, and toileting himself. He selects what he wants to eat, and makes appropriate and healthy food choices. However, the AIP requires supervision, especially if traveling, because of his memory impairments. He also occasionally requires reminders to brush his teeth, although he often does this without prompting. The AIP was able to locate his room at St. Barnabas, and made friends with other patients while there. He also recognized Mr. Golden each time he saw him, and engaged in conversations with him. Mr. Golden described the AIP as a “bright man.”
The AIP stated that he was born in New York, and provided the names of his parents and his last employer, a school in Manhattan. He further stated that he was unmarried and had no children. The AIP explained that he used to own a home in Long Island, which his parents had left him, but that he no longer did. The AIP would also draw maps in an attempt to describe where his sisters’ residence was located. However, he was never able to provide the specific address of that residence.
The AIP receives Social Security and pension benefits, but Mr. Golden was unsure of the amount of both. The AIP informed Mr. Golden that he maintained an account at TD Bank. Mr. Golden and other staff accompanied the AIP to TD Bank, and while they confirmed that the AIP had an account there, they refused to provide any information about the account balance. The bank employee also stated that the account was linked to an address in Long Island, New York, but was otherwise unable to provide any information about the AIP
Mr. Golden opined that the AIP would be unable to return to the community at this time. Given the circumstances that brought him to St. Barnabas Hospital, and the staffs observation of the AIP during his time there, there is a clear indication that the AIP has memory issues that compromise his ability to safely travel on his own. This would, in turn, affect his ability to carry out tasks such as go shopping and conduct his banking. The AIP requires assistance with finding a suitable place to live, as he is unable to provide specific information about where he would return to live in the community, and although he provided the names of two siblings, none of those people have been found. Finally, the AIP also needs assistance with marshaling his assets, as he is unable to provide specific information about the nature, sources, and amount of his income and property.
The petitioner’s attorney called Jacqueline Perrier, who testified that she is the AIP’s social worker at Westchester Center *816 for Rehabilitation. The AIP was admitted to Westchester Center on September 18, 2014. She has met with the AIP “several times,” and accompanied him to the hearing. While the AIP entered with diagnoses of Alzheimer’s disease and altered mental status, the psychiatrist at Westchester Center in a note dated October 13, 2014 stated that while the AIP has “adjustment issues,” he is mentally intact. However, her observations indicate that the AIP has cognitive shortcomings that affect his ability to recall important details of his life.
The AIR for example, stated that prior to these recent admissions, he was living somewhere in the Bronx, but he was unable to provide an exact address. The AIP is able to give his age, date of birth, former occupation, and place of employment. He was employed as a school teacher at a now defunct Catholic school. The AIP is able to feed himself, and makes appropriate food choices, and dress himself, but he requires supervision and prompting to shower because he does not like to do so. He is able to state the year, month, and date, and was coherent during their interactions. Ms. Perrier also described the AIP as a “bright” man, who watched Jeopardy daily and was able to correctly answer many of the questions. This, she opined, was consistent with her observation that while the AIP could recall facts from the past, he was unable to provide vital information about his recent past.
In addition, although the AIP is able to locate his room at Westchester Center, he at times becomes disoriented. For example, despite her having repeatedly shown the AIP where the dining room was located and how to get there, he continues to ask her how to do so. The dining room floor is only one floor below the room where his floor is. The AIP now eats all his meals in his room. The AIP has no known family members, although he mentioned having two sisters, Mary and Rose, who lived in Long Island, New York. Otherwise, the AIP has provided the name of two friends in the community, but these individuals turned out to be people he met during his admission in St. Barnabas. The AIP states that he has had several visitors at the nursing home, but the nursing home records do not reflect that. Instead, the AIP has only been visited by one individual whom he met while at St. Barnabas. The AIP claims that one of these visitors is a gentleman from Long Island, but he was unable to ascertain the gentleman’s address or phone number, because the gentleman leaves “too quickly.” The AIP indicated that he had no advance directives, and when asked to nominate someone to serve as his agent, he did not provide any names.
*817 Ms. Perrier opined that while the nursing home was not necessarily the most ideal setting for someone with the AlP’s functional capacity, the AIP would need assistance in locating and securing an appropriate place to live. He would also require assistance with shopping and cooking, and general supervision for many of his activities of daily living. The AIP also needs assistance to marshal his assets, and would be unable to handle his finances on his own, especially given his memory issues, brought on by possible dementia.
The AIP testified that his name is Joseph Myron G., Jr., he is 73 years old, and presently resides at Westchester Center in Mount Risco, New York. He has two sisters, Rose Adel Theresa G. and Mary Elizabeth G., both of whom are in their 60s. He spoke fondly of a friend, Mark Roemer, with whom he traveled and resided on and off for the past two decades. He was never married, and had no children. He was careful to explain that as a Catholic, he did not believe he could have one without the other. While there were two women whom he would have married, prior to marrying them he discovered that these women were unable to have children, and so he never went through with it.
Mr. G. testified that prior to his admission to St. Barnabas, he had been living with his sisters in their home in the Bronx for 2 to 2V2 weeks. He last saw his sisters on the morning of his admission. On that morning, he woke up early, so that he could go for a walk to Fordham University. Before heading to Fordham University, he went to White Castle where he purchased a meal. He left White Castle and intended to return to his sisters’ home, but he could not recall the directions. He went to a nearby Rite Aid, where he called and asked the police to pick him up because he was confused. The police then brought him to St. Barnabas. When he arrived there, he discarded his wallet containing his identification. However, he claims to have another wallet with other identifying information, in his backpack which he left at his sisters’ home.
The AIP lived in Great Neck, New York until he was 10 years old. Then, in 1925, his family moved to a house that his parents had purchased, in Westbury. When he was younger, he discovered that he had two other siblings, Ana and John, but that they had died before he met them. The AIP attended Clark High School, and later received a Bachelor’s degree in English from Marist College in Poughkeepsie, New York. He subsequently received a grant from Fordham University, and began pursuing a Master’s *818 degree, but he never completed it. It was unclear what topics the grant or the Master’s degree were related to, but the AIP made some mention of intending to travel to France to study French.
The AIFJ who described himself as “very Catholic,” worked for 20 to 25 years as a teacher at St. Anthony’s, a school located in Greenwich Village. He initially taught mathematics, but later started teaching other subjects. He stopped teaching when the school closed in 2005, and since that time he has earned an income writing workbooks for teachers. He also worked as a tutor, and would acquire clients by posting signs in East Meadow Library in Long Island. He maintains contact with Sister Arnette, the former principal of St. Anthony’s, who he describes as his “good friend.” He also visits the site of the school every year in recognition of St. Anthony’s day. The AIP was unclear on when he met his other good friend, Mark, stating variously that they met 20 years ago, when the AIP was 62 years old, and in 1962. Mark was approximately 40 years old when they met. He met Mark when one overheard the other speaking French, and they bonded over their knowledge of the language. At some point during their friendship, Mark inherited a large sum of money, and using that money, the two lived together in numerous places for at least 15 years. Although Mark was not married, he had many girlfriends during the course of their friendship. He last lived with Mark four years ago.
The AIP agreed to having a guardian appointed to assist him with his finances. However, he denied having any memory issues, claiming that he could recall things from 5 to 10 years ago. He further explained that, contrary to Ms. Perrier’s testimony, he did not have issues with finding the dining room. Instead, he either eats his meals early or in his room because the dining room becomes too crowded with the other patients in their wheelchairs accompanied by their aides. Despite maintaining that he did not have any memory issues, the AIP initially stated that he wanted a guardian to assist him with finding a place to live. However, he later stated that he wanted to return to Westbury, and that he did not need assistance with finding a place to live. The AIP also initially stated that he did not need help with making medical decisions, because his mother was a doctor so he was well-versed on those issues. However, he later stated that he would agree with someone being appointed to make medical decisions on his behalf, so long as those decisions were for his benefit, and were explained to him. He ultimately concluded that a guardian would not be “bad.”
*819 There is no evidence that the AIP executed any advance directives.
Based on the foregoing, the court finds that having been aware of the powers of a property and personal needs guardian, and of the fact that he was relinquishing certain rights as a consequence of such appointment, the AIP freely and knowledgeably consented to the appointment of a personal needs and property guardian, with limited powers. The court also finds that the AIP had the requisite capacity to agree to said appointment, as he was able to meaningfully interact with the court, understood the nature of the proceeding and understood the personal needs and property management powers he was relinquishing. (See Matter of Buffalino [James D.], 39 Misc 3d 634 [Sup Ct, Suffolk County 2013].)
Mental Hygiene Law § 81.15, entitled “Findings,” provides:
“(a) Where the court determines that the person agrees to the appointment and that the appointment is necessary, the court shall make the following findings on the record:
“1. the person’s agreement to the appointment;
“2. the person’s functional limitations which impair the person’s ability to provide for personal needs or property management;
“3. the necessity of the appointment of a guardian as a means of providing for personal needs and/or property management for the person;
“4. the specific powers of the guardian which constitute the least restrictive form of intervention consistent with the person’s functional limitations; and
“5. the duration of the appointment.”
Here, the record discloses Mr. G.’s consent to the petition. (Mental Hygiene Law § 81.15 [a] [1].) While Mr. G. is articulate, his testimony demonstrates mental impairment which clearly warrants the need for the appointment of a guardian. In this regard, Mr. G.’s appearance at St. Barnabas Hospital without any knowledge of where he had been residing, and his continuing inability to identify any concrete particulars as to his residence, the location or identity of his relatives, and the particulars of his finances, establishes that he is functionally impaired. (Mental Hygiene Law § 81.15 [a] [2].) These mental impairments clearly warrant the appointment of a guardian, as Mr. G. is unable to attend to his finances, obtain housing, or discern his own needs. (Mental Hygiene Law § 81.15 [a] [3].) Lastly, as *820 the continuing nature of Mr. G.’s inability to recollect his recent past shows no sign of abating, he will require a guardian for an indefinite time. (Mental Hygiene Law § 81.15 [a] [5].)
As to the specific powers of the guardianship, the court notes that the parties stated that they had agreed to limit the powers which the guardian should exercise. At no point, however, did the court indicate, on or off the record, that it would limit the powers of the guardianship in any way, except as the court determined to be required by the evidence of Mr. G.’s abilities and impairments. Nor was Mr. G.’s consent contingent upon or conditioned in any manner on the court granting the guardian only those powers which the AIP had specifically consented to. Had the consent been so conditioned, it would not, in the present case, have been accepted by the court.
Mental Hygiene Law § 81.02 provides that
“(a) The court may appoint a guardian for a person if the court determines:
“1. that the appointment is necessary to provide for the personal needs of that person, including food, clothing, shelter, health care, or safety and/or to manage the property and financial affairs of that person; and
“2. that the person agrees to the appointment, or that the person is incapacitated.”
The statute thus makes it clear that the consent of the AIP makes a finding of incapacity unnecessary. In effect, the consent takes the place of the finding of incapacity. Once there is consent, the court is free to then appoint a guardian, with the least restrictive powers as may be necessary to accomplish the purpose of the statute. The finding of consent does not encompass the granting of powers to the Alfi unless there is an explicit understanding that such is the case. There is thus no impediment to the court accepting the AIP’s consent to the appointment of a guardian, and then reserving to itself the right to delineate the powers to be given to the guardian. Significantly, Mental Hygiene Law § 81.16 (c) (1) provides:
“If the person alleged to be incapacitated is found to have agreed to the appointment of a guardian and the court determines that the appointment of a guardian is necessary, the order of the court shall be designed to accomplish the least restrictive form of intervention by appointing a guardian with powers limited to those which the court has found neces *821 sary to assist the incapacitated person in providing for personal needs and/or property management.”
The inclusion of the language “to those which the court has found necessary” (emphasis added) clearly indicates that the legislature intended that the court determine which powers be granted to the guardian, even when the AIP has consented to the appointment of a guardian.
Accordingly, Joseph G.’s consent to the appointment of a property and personal needs guardian is accepted by the court, and Mr. G. is hereby deemed to be a person in need of a guardian.
A guardianship of the person and property is required for an indefinite duration.
Conclusions
Upon the testimony taken at the hearing and the documents submitted, the court will appoint United Guardianship Services, 5614 16th Avenue, Brooklyn, NY 11204, telephone number 718-466-2200, as guardian of the PING’s person and property.
The guardian of the person and property shall be granted the following powers:
a. to acquire health insurance for the PING; to marshal the PING’s assets;
b. to choose the place of abode for the PING, specifically, the guardian shall locate and secure housing for the PING, provided that the choice of abode must be consistent with the findings under section 81.15 of the Mental Hygiene Law, the existence of and availability of family, friends and social services in the community, the care, comfort and maintenance, and where appropriate, rehabilitation of the PING, the needs of those with whom the PING resides; retention or subsequent placement of the PING in a nursing home or residential care facility as those terms are defined in section 2801 of the Public Health Law, or other similar facility shall not be authorized without the consent of the PING so long as it is reasonable under the circumstances to maintain the PING in the community, or in a less restrictive setting;
c. to consent to or refuse generally accepted routine or major medical or dental treatment subject to the provisions of section 81.22 (a) (8) of the Mental Hygiene Law dealing with life sustaining treatment; the guardian shall make treatment decisions consistent with the findings herein pursuant to Mental *822 Hygiene Law § 81.15 and in accordance with the PING’s wishes, including the PING’s religious and moral beliefs, or if the PING’s wishes are not known, and cannot be ascertained with reasonable diligence, in accordance with the PING’s best interests, including a consideration of the dignity and uniqueness of every person, the possibility and extent of preserving the PING’s life, the preservation, improvement or restoration of the PING’s health or functioning, relief of the PING’s suffering, the adverse side effects associated with the treatment, any less intrusive alternative treatments, and such other concerns and values as a reasonable person in the PING’s circumstances would wish to consider;[2]
d. to make reasonable expenditures from the PING’s assets, for the purpose of providing support of the PING in the event the annual income is insufficient to meet the PING’S needs;
e. to marshal and invest the PING’s assets in investments eligible by law for the investment of trust funds and to dispose of investments so made and reinvest the proceeds as so authorized;
f. to pay any existing debts or claims which have been proved to the satisfaction of the guardian as being properly due and owing;
g. to preserve, protect and account for such property faithfully; to retain or employ attorneys, accountants or other professionals to assist in the performance of the duties of the guardian;
h. the guardian may not alienate, mortgage, lease or otherwise dispose of real property without the specific direction of the court obtained upon the proceedings taken for that purpose as prescribed in article 17 of the Real Property Actions and Proceedings Law, provided however, that without instituting such proceedings, the guardian of the property may, without the authorization of the court, lease any real property for a term not exceeding five years;
i. to pay funeral expenses;
j. to engage in Medicaid planning, however any transfers of assets shall be effectuated only upon proper application to the court;
k. to file tax returns and pay tax liabilities; and
*823 1. to defend or maintain any civil judicial proceeding.[3]
The court also grants the guardian of the person and property the following powers, to the extent that they are necessary for the effectuation of the aforementioned powers of marshaling the PING’s assets, acquiring coverage for his health care, making medical decisions on the PING’s behalf, and choosing and securing the PING’s place of abode:
a. to determine who should provide personal care or assistance;
b. to apply for government and private benefits on behalf of the PING; and
c. to authorize access to or release of the PING’s confidential records. These powers constitute the least restrictive form of intervention consistent with the PING’s functional limitations.

. While the petitioner’s attorney requested that the respondent herein be declared a “Person in Need of a Guardian” (PING), and that the guardianship be based on the respondent’s consent, the court notes that pursuant to article 81 of the Mental Hygiene Law and the pertinent case law, the court must first determine whether the subject of the proceeding has the requisite capacity to consent, and must then make a finding of the AIP’s agreement, on the record.

. This particular power was given pursuant to the PING’s own testimony that he would be amendable to a guardian being given this power, so long as the decisions made were explained to him, and were in his best interest.

. The powers in subsections (d) to (1), typically given to the property management guardian, were given because the PING, in his testimony, stated that he required assistance with managing his financial affairs, and desired that a guardian be appointed to assist him with handling all his financial affairs.